identify himself and to account for his presence when requested by any peace officer so to do, if the surrounding circumstances are such as to indicate to a reasonable man that the public safety demands such identification.

*Kolender*, 461 U.S. at 353 n.1. The *Kolender* court found that, although the initial detention might be justified by the "surrounding circumstances" clause, the discretion accorded to police to determine what was or was not "credible and reliable" identification was impermissibly vague.

The Michigan stalking statute is dissimilar to the statutes at issue in these cases. In both those cases, totally innocuous behavior could be criminalized. Here, the detailed nature of the Michigan stalking statutes prevents such arbitrary enforcement. Again, the district court erred in engaging in an independent assessment of the stalking statutes rather than following the strictures set forth in AEDPA and as explained in *Williams*. In sum, Petitioner has not established that the state courts' conclusion that the stalking statute is not vague is directly contrary to, or an unreasonable application of federal law, as established by the Supreme Court.

### V. Conclusion

The state court's determination that the Michigan stalking statute is not vague or overbroad was not contrary to, or an unreasonable application of, federal law as it existed in 1995-1996. We therefore **REVERSE** the district court's grant of Staley's petition for writ of habeas corpus.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0037P (6th Cir.)
File Name: 01a0037p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

JERRY LEE STALEY,
    *Petitioner-Appellee,*

    *v.*    No. 00-1809

KURT JONES,
    *Respondent-Appellant.*

Appeal from the United States District Court
for the Western District of Michigan at Kalamazoo.
No. 99-00312—Richard A. Enslen, Chief District Judge.

Argued: October 26, 2000

Decided and Filed: February 5, 2001

Before: SUHRHEINRICH and MOORE, Circuit Judges;
EDMUNDS, District Judge.

———————————

### COUNSEL

**ARGUED:** Janet A. Van Cleve, OFFICE OF THE ATTORNEY GENERAL, HABEAS CORPUS DIVISION, Lansing, Michigan, for Appellant. David A. Dodge, DODGE

---

    *The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

& DODGE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Janet A. Van Cleve, Jennifer M. Granholm, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellant. David A. Dodge, DODGE & DODGE, Grand Rapids, Michigan, for Appellee. Michael J. Hodge, MILLER, CANFIELD, PADDOCK & STONE, Lansing, Michigan, George D. Mesritz, MILLER, CANFIELD, PADDOCK & STONE, Detroit, Michigan, T. Lynn Hopkins, KENT COUNTY PROSECUTOR'S OFFICE, Grand Rapids, Michigan, Tina M. Weatherwax-Grant, Lansing, Michigan, for Amici Curiae.

---

## OPINION

---

SUHRHEINRICH, Circuit Judge.

### I. Introduction

On January 1, 1993, the Michigan Legislature enacted a comprehensive stalking law, Mich. Comp. Laws 750.411h ("Stalking") and 750.411i ("Aggravated Stalking").[1] The law defines "stalking" as "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested." Mich. Comp. Laws Ann. § 750.411i(e). "Harassment" is defined as "conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that

---

[1]California passed the nation's first stalking law in 1990. *See* Matthew J. Gilligan, Note, *Stalking the Stalker: Developing New Laws to Thwart Those Who Terrorize Others*, 27 Ga .L. Rev. 285, 287 (1992). Every state now has an anti-stalking law. *See* Sharon A. Madere, Comment, *Paparazzi Legislation: Policy Arguments and Legal Analysis in Support of Their Constitutionality*, 46 UCLA L. Rev. 1633, 1645 (1999).

frightened, intimidated, threatened, harassed or molested. Furthermore, the harassment must also cause a reasonable individual to suffer emotional distress, an objective standard. The exclusion, for "conduct that serves a legitimate purpose," is, as Respondent concedes, not defined. But this does not transform an otherwise unambiguous statute into a vague one. As the *White* court noted, a person of reasonable intelligence would know whether his conduct was violating the statute. Furthermore, as the Michigan Court of Appeals implicitly determined in Staley's case, the statute was certainly not vague as applied to Staley, as his conduct falls squarely within the heartland of conduct the statute is designed to prohibit.

Although the *White* court did not discuss in detail the "arbitrary enforcement" aspect of the vagueness analysis, because the issue was not raised in that case, it did indicate that the claim would fail. Again, such a conclusion is not contrary to, or an unreasonable application of, federal law. As noted, the statute contains requirements that significantly narrow its application and the discretion of police in enforcing the statute. Further, since Staley's conduct easily met all the elements of the statute, its application to him was not an arbitrary act by law enforcement.

The district court cited two cases in support of its conclusion that the statute would be impermissibly vague if the *White* court had not limited the "conduct that serves a legitimate purpose" exemption. The state courts' decision is not directly contrary to, or an unreasonable application of, these decisions. In *Papachristou*, 405 U.S. 156, the Supreme Court struck down a municipal ordinance providing criminal sanctions for "wandering or strolling around from place to place without any lawful purpose or object." In *Kolender*, the Supreme Court invalidated as unconstitutionally vague a criminal statute which provided:

Every person who commits any of the following acts is guilty of disorderly conduct, a misdemeanor: . . . (e) Who loiters or wanders about the streets or from place to place without apparent reason or business and who refuses to

that men of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Id.* at 49. . . . (1988).

Applying the law to the facts of this case, we believe that the stalking statutes provide fair notice of the prohibited conduct. A person of reasonable intelligence would not need to guess at the meaning of the stalking statutes, nor would his interpretation of the statutory language differ with regard to the statutes' application, in part because the definitions of crucial words and phrases that are provided in the statutes are clear and would be understandable to a reasonable person reading the statute. *Id.* Also, the meaning of the words used to describe the conduct can be ascertained fairly by reference to judicial decisions, common law, dictionaries, and the words themselves because they possess a common and generally accepted meaning. We therefore conclude that the statutes are not void for vagueness on the basis of inadequate notice.

Third, defendant asserts that "the trier of fact has unstructured and unlimited discretion to determine whether the complainant was receiving a series of contacts in a positive or in a negative fashion," which renders the statutes vague. This argument must also fail. Vagueness cannot be established under this prong unless the wording of the statute itself is vague, which the defendant does not allege *and which we do not find.* Accordingly, we conclude that the stalking statutes are not void for vagueness under these standards.

*White*, 536 N.W.2d at 884 (internal citations omitted; emphasis added).

The state court's conclusion that the Michigan stalking law gives fair notice of what conduct is proscribed is not directly contrary to Supreme Court precedent or an unreasonable application of it. The statute defines the offense of stalking as a "willful course of conduct" that is repeated or continuing harassment that causes a reasonable person to feel terrorized,

would cause a reasonable individual to suffer emotional distress and that actually causes the victim to suffer emotional distress." *Id.* § 750.411i(d). Expressly excluded from the definition of "harassment" is "constitutionally protected activity or conduct that serves a legitimate purpose." *Id.*[2]

On habeas review the district court ruled that the aggravating stalking statute was unconstitutionally overbroad in violation of the First Amendment because the exclusions for "constitutionally protected activity" and "conduct that serves a legitimate purpose" are so limited that the scope of conduct covered by the statute applied to core First Amendment conduct. The court therefore granted Petitioner Jerry Lee Staley's petition for writ of habeas corpus on July 14, 2000.[3]

The matter is now before us on the expedited appeal of Respondent Warden Kurt Jones ("Respondent"). Michigan State Senator Dianne Byrum, The Michigan Coalition Against Domestic and Sexual Violence, The Michigan Sheriffs' Association, and The National Organization for Women, Michigan Conference have filed a joint brief supporting Respondent's position. The Prosecuting Attorneys Association of Michigan, along with the Michigan Domestic Violence Prevention and Treatment Board have also filed a joint amicus brief supporting Respondent's view.

---

[2] Staley was charged with Aggravated Stalking. Thus, only the statutory definitions from § 750.411i are quoted. The definitions in § 750.411h are identical.

[3] The district court issued a fourteen-day stay of Staley's release until July 28, 2000, to allow Respondent, Warden Kurt Jones, to request a stay in this Court. Respondent did so, and on July 27, 2000, this Court issued a stay pending resolution of this appeal.

## II. Background

### A. Facts

In late 1993, Petitioner Jerry Lee Staley was charged with aggravated stalking of his ex-girlfriend, Joellyn Weber. Weber began seeing Staley in April of 1993. She was separated from her husband at the time. On July 4, 1993, however, Weber told Staley that she did not want to see him anymore, because she had reunited with her husband. In October, Weber received a phone call from Staley's sister-in-law reporting that Staley's brother had died the previous evening and that, in the sister-in law's view, Weber should talk with him. Weber started seeing Staley again as a result of that call. She was separated from her husband again at the time.

On October 31, 1993, Weber and her son Ronnie were visiting Staley at his home. Weber wanted to go shopping, but Staley did not want her to go without him. Weber testified that Staley "threw her around" and tore up her purse. When Weber went to work the next day, Weber had what she characterized as a nervous breakdown and was hospitalized. Weber was discharged on November 5th, went to Staley's home to pick up some belongings, and told Staley the relationship was over.

That night, when Weber was asleep, Staley entered her home and confronted Weber in her bedroom, trying to get her to change her mind. Weber repeatedly asked him to leave, but he did not. When she yelled for her son, Staley put his hand over her mouth. Weber bit his hand and screamed for her son, who came running. Weber eventually succeeded in getting Staley downstairs. She and her son also went downstairs. Both Weber and Ronnie tried to call the police, but Staley prevented them. Later, Weber tried to push Staley out the front door, and he threw her across the kitchen into the stove. He then left.

Staley then began calling Weber up to fifteen times a day, at home and at work. Weber continued to tell him that she

*Legislation*, 31 Harv. J. on Legis. 1, 9-11 (1994) (characterizing the Michigan statute as troubling because it lacks a specific intent requirement). Thus, under § 2254(d)(1), a federal habeas court cannot say that the Michigan courts erred in disallowing a facial challenge on vagueness grounds.

### E. Vagueness

As noted, had the district court not narrowly interpreted the statutory exemptions in *White*, it would have found the Michigan stalking law unconstitutionally vague. It reasoned that, otherwise, the statute provides no guidance to the public and police as to what constitutes a "legitimate purpose." *See Staley*, 108 F. Supp. 2d at 786 n.4.

Like overbreadth, the vagueness doctrine was also well-defined at the time of the state court decisions. The Supreme Court has held that the "void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender,* 461 U.S. at 357 (citing *Hoffman Estates,* 455 U.S. 489); *Goguen*, 415 U.S. 566; *Grayned v. City of Rockford*, 408 U.S. 104 (1972); *Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972); *Connally v. General Constr. Co.*, 269 U.S. 385 (1926)). The doctrine focuses on both actual notice and arbitrary enforcement. *See id.* at 357-58.

The *White* court stated:

The United States Supreme Court has stated that the "void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 . . . (1983). . . . Further, a statute does not provide fair notice of proscribed conduct if it "'either forbids or requires the doing of an act in terms so vague

circumstances' test, which has been labeled and deemed 'draconian,' cannot be reconciled with the *Papachristou, Kolender,* and *Morales* decisions." (footnotes omitted)).[27]

As the district court noted, the Supreme Court has indicated that the absence of an intent requirement is an important consideration when determining whether a statute is unconstitutionally vague. *See Colautti v. Franklin*, 439 U.S. 379, 395 (1979) ("This Court has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of mens rea."). The Court has not, however, unequivocally stated that in such a situation, a statute may be facially invalidated on vagueness grounds without considering whether the statute is invalid in all applications. Indeed, in *Hoffman Estates,* the Supreme Court noted that the Court has recognized that a scienter requirement may mitigate a law's vagueness, *see Hoffman Estates*, 455 U.S. at 498, but at the same time stated that when a statute is challenged on vagueness grounds, "the complainant must demonstrate that the law is impermissibly vague in all of its applications," *Id.* at 497. Given the absence of clear Supreme Court precedent on the subject, the *White* court's opinion is not contrary to clearly established federal law, whether or not the Michigan statute lacks a scienter requirement. *See* Robert P. Faulkner & Douglas H. Hsaio, *And Where You Go I'll Follow: The Constitutionality of Antistalking Laws and Proposed Model*

---

[27] *Compare, e.g., Young v. American Mini Theatres*, 427 U.S. 50 (1976), which declined to invalidate ordinances restricting the exhibition of sexually explicit movies on facial vagueness grounds because the ordinances were "unquestionably applicable" to the claimant's speech and the Court was "not persuaded" that the "ordinances [would] have a significant [chilling] effect on the exhibition of films protected by the First Amendment"), *with Kolender v. Lawson*, 461 U.S. 352 (1983), where the Supreme Court invalidated as vague on its face a statute requiring "persons who loiter or wander on the streets to provide 'a credible and reliable' identification and to account for their presence when requested by a peace officer," because the law "[reached] a substantial amount of [protected first amendment] conduct," even though it was not "vague in all of its applications."

did not want to see him any more. On November 15, 1993, Staley rammed Weber's car with his truck and chased her with a baseball bat.

Staley returned the next day, November 16, 1993. Weber testified that:

> I was – my son and I were home. My son was upstairs playing pool. I was in my laundry room doing laundry. And I came out. And he was standing in my living room. He broke in through the back door. And I just immediately sat down. And I just kept looking at the floor and asking – I just kept repeating, please leave, please leave. He just slowly started inching towards me on my couch. So I just picked up the phone and I called my brother and – or my brother's home. And my sister-in-law answered. She asked me if everything was okay. I said no. And she said, he's there, isn't he. And I said, yes. And he kept sayin', who are you talkin' to, bitch, tell me who you're talkin' to. And I wouldn't say anything. I just kept sayin', please leave, please leave.
>
> And he went out into the kitchen and he yanked the cord out of the plug-in in the wall. And he came back in and he had a buck knife with him. And he held it by the point and was like this at me (demonstrating ) and told me, tell me who you're talkin' to, bitch, or I'm gonna slice your gut wide open.
>
> And I knew at that point I had to get out. But my son was upstairs. And I yelled for him. And I didn't know it at the time, but he was just sitting at the top of the stairs. And he came running down. And I went to jump over my love seat. And I – he grabbed me. And I – I just screamed, Ronnie, call 911, get outta here. And he pulled me back to him and he put the knife right to my throat and he said, bitch, tell me who you're talkin' to or I'm gonna slice ya ear to ear. And I screamed to Ronnie to call 911. And he just flung me. And he pulled his pants out and shoved the knife in and he said, fuck it, I'm

gonna go kill your brother and his wife and his kids. And out the door he went.

Later that night, Staley called and told Weber she'd better get out of town, that he was going to kill her mother, her son, and her brother, and that he was going to come to her store the next day and kill her.

After threatening to burn down her house, Staley asked Weber if she had checked her smoke alarm recently. When Weber checked the alarm, the battery was missing. In December 1993, Weber started taping Staley's phone calls. One evening Staley called constantly from 6:20 p.m. to 2:30 a.m. when Weber took the phone off the hook. The tape was played for the jury, who heard Staley threatening to burn Weber in her sleep, and told her to "say goodbye to Ronnie."

### B. Procedural History

On the day of his conviction, Staley pled guilty to being a habitual offender, fourth offense, in violation of Mich. Comp. Laws § 769.12. He was initially sentenced to life imprisonment. Staley appealed his conviction, claiming that the Michigan stalking statute is unconstitutional and that his sentence was disproportionate. The Michigan Court of Appeals rejected Staley's constitutional claim, but held that his sentence was excessive and disproportionate. *See State v. Staley*, No. 178555 (Mich. Ct. App. Aug. 20, 1996) (unpublished per curiam). On remand, Staley was sentenced to 15-25 years imprisonment. The Michigan Supreme Court denied leave to appeal on May 30, 1997. *See People v. Staley*, 564 N.W.2d 898 (Mich. May 30, 1997) (No. 107330).

Having fully exhausted his remedies in state court, Staley filed this federal habeas action. The district court granted Staley's petition for writ of habeas corpus after concluding that the antistalking statute violates the First Amendment because it is overbroad. *See Staley v. Jones*, 108 F. Supp. 2d 777 (W.D. Mich. 2000).

in this case in 1996, obviously could not have erred, for purposes of § 2254(d)(1), by following *Salerno*. Moreover, as the district court observed, and the debate between Justice Scalia and the plurality in *Morales* reveals, there was no "*clearly* established federal law" as determined by the Supreme Court in 1996 as to the proposition that a facial attack outside the First Amendment context did not also consider the defendant's conduct.[26] *See United States v. Frandsen*, 212 F.3d 1231, 1235 n.3 (11th Cir. 2000) (noting that "'the *Salerno* rule,' has been subject to a heated debate in the Supreme Court, where it has not been consistently followed"); Michael C. Steel, *Constitutional Law -- The Vagueness Doctrine: Two-Part Test, or Two Conflicting Tests? City of Chicago v. Morales*, 119 S.Ct 1849 (1999), 35 Land & Water L. Rev. 255, 271 (2000) ("*Salerno's* 'no set of

---

[26]Although not pertinent to a habeas review, it is nonetheless noteworthy that this Court's precedent on this issue is also inconsistent. *Compare, e.g., Belle Maer Harbor v. Charter Township of Harrison*, 170 F.3d 553, 557 (6th Cir. 1999) ("However, even in cases not involving First Amendment rights, we have recognized that courts may engage in a facial analysis where the enactment imposes criminal sanctions."); *Women's Medical Professional Corp. v. Voinovich*, 130 F.3d 187, 193-97 (6th Cir. 1997) (holding that that *Salerno* is not applicable to facial challenges to abortion regulations); *Springfield Armory, Inc. v. City of Columbus*, 29 F.3d 250, 252-54 (6th Cir. 1994) (rejecting the district court's "as-applied" analysis because statute contained criminal penalties, holding that the statute at issue was not unconstitutionally vague on its face); *with Amelkin v. McClure*, 205 F.3d 293, 296 (6th Cir. 2000) (stating that facial challenges are normally rejected because a person to whom the statute may be constitutionally applied may not challenge the statute on behalf of third parties; citing *Salerno*); *Voinovich*, 130 F.3d at 218 (Boggs, J., dissenting) ("the *Salerno* Court rested its holding on the long-recognized proposition that, except in the First Amendment context, facial challenges to statutes are disfavored"); *United States v. Avant*, 907 F.2d 623, 625 (6th Cir. 1990) (holding that vagueness challenge to a criminal statute not involving First Amendment rights is limited to the facts of the case at hand).

Furthermore, scholarly comment on the subject discusses the debate both within the Supreme Court and among scholars over when litigants should be able to mount facial challenges. *See, e.g.,* Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321 (2000).

rely on the overbreadth doctrine to entertain a facial challenge, "[f]or it is clear that the vagueness of this enactment makes a facial challenge appropriate." *Id.* at 55; *see also id.* ("When vagueness permeates the text of such a law, it is subject to facial attack."). The plurality opinion further remarked that "[w]hether or not it would be appropriate for federal courts to apply the *Salerno* standard in some cases – a proposition which is doubtful – state courts need not apply prudential notions of standing created by this Court. . . . JUSTICE SCALIA'S assumption that state courts must apply the restrictive *Salerno* test is incorrect as a matter of law." *Id.* at 55 n.22.

*Morales* was not decided until 1999; *Salerno* was decided in 1987. The *White* court, in 1995, and the state appeals panel

---

*their facial challenge).* Since we, like the Illinois Supreme Court, conclude that vagueness permeates the ordinance, a facial challenge is appropriate. We need not, however, resolve the viability of *Salerno's* dictum, because this case comes to us from a state – not a federal – court. When asserting a facial challenge, a party seeks to vindicate not only his own rights, but those of others who may also be adversely impacted by the statute in question. In this sense, the threshold for facial challenges is a species of third party (jus tertii) standing, which we have recognized as a prudential doctrine and not one mandated by Article III of the Constitution. *See Secretary of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 955 . . . (1984). When a state court has reached the merits of a constitutional claim, "invoking prudential limitations on [the respondent's] assertion of jus tertii would serve no functional purpose." *City of Revere v. Massachusetts Gen. Hospital*, 463 U.S. 239, 243 . . . (1983) (internal quotation marks omitted). Whether or not it would be appropriate for federal courts to apply the *Salerno* standard in some cases – a proposition which is doubtful – state courts need not apply prudential notions of standing created by this Court. *See ASARCO Inc. v. Kadish*, 490 U.S. 605, 618 (1989). *JUSTICE SCALIA'S assumption that state courts must apply the restrictive Salerno test is incorrect as a matter of law; moreover it contradicts "essential principles of federalism."* *See* Dorf, *Facial Challenges to State and Federal Statutes*, 46 Stan. L. Rev. 235, 284 (1994) (emphasis added).

---

## C. District Court Ruling

Staley argued that Michigan's aggravated stalking statute is unconstitutionally vague, places defendants at risk of double jeopardy, and unconstitutionally shifts the burden of proof to the defendant. *See id.* at 779. The district court rejected Staley's double jeopardy and burden-shifting claims, but agreed that his vagueness arguments have merit because the statute could potentially be applied in violation of the First Amendment. *See id.* at 779-80, 788.

The district court began by analyzing the statute. The court noted that the statutory definition of "stalking" has three distinct elements. First, "stalking" requires a "willful course of conduct involving repeated or continuing *harassment* of another." *Id.* at 781. Second, the term "requires that the *harassment* would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested." *Id.* Third, the definition "requires that the *harassment* actually cause the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested." *Id.*

Next, the court noted that the term "harassment" has three parts. First, harassment is "'conduct directed toward a victim.'" *Id.* (quoting Mich. Comp. Laws § 750.411i(d)). Second, the harassment is conduct that "'includes, but is not limited to, repeated or unconsented contact, that would cause a reasonable individual to suffer emotional distress.'" *Id.* (quoting § 750.411i(d)). Third, the definition provides that "'[h]arassment does not include constitutionally protected activity or conduct that serves a legitimate purpose.'" *Id.* (quoting § 750.411i(d)).

The court rejected Staley's argument that part two of the harassment definition was unclear because it contains the phrase "includes, but is not limited to." *Id.* at 785-86. In accordance with the well-settled rule of statutory construction that statutes should be construed to avoid constitutional problems, the court concluded that the phrase could "be read to mean that harassing conduct *requires* repeated unconsented

contacts that cause emotional distress and that it *may also* include other types of contact." *Id.* at 785. The district court noted that "[t]his reading focuses on the word 'includes' and interprets the 'but is not limited to' clause to mean simply that, assuming the existence of repeated unconsented contacts, other types of contact may be present as well." *Id.*

The district court then turned to Staley's argument that part three of the harassment definition was unconstitutionally vague because the phrases "constitutionally protected activity" and "conduct that serves a legitimate purpose" were not defined. *See id.* at 786-88. Staley argued that since the statute was unclear as to what kinds of conduct were excluded from the statute's reach, the statute violated the First and Fourteenth Amendments. *See id.*

The district court began its discussion by reciting the well-settled principle that an individual may challenge a statute on its face if that statute infringes on First Amendment freedoms.[4] It found the question of whether facial challenges can be mounted on due process grounds to be unsettled,[5] but nonetheless held that Petitioner's due process arguments warranted facial analysis of the statute because: (1) the statute contains no substantial *mens rea* requirement; (2) the statute provides substantial criminal penalties, including imprisonment; and (3) recent precedent indicates that such challenges are appropriate. *See id.* at 782-83.

Next, in recognition of the principle that a federal court reviewing a state statute for vagueness should analyze the statute as the highest state court has interpreted it, the district court looked to *People v. White*, 536 N.W.2d 876 (Mich. Ct. App. 1995). In *White*, the Michigan Court of Appeals stated

---

[4] *See Staley*, 108 F. Supp. 2d at 782 (citing, *inter alia, Broadrick v. Oklahoma*, 413 U.S. 601, 612-15 (1973)).

[5] *See id.* (comparing, *inter alia, Chicago v. Morales*, 527 U.S. 41, 74-84 (1999) (Scalia, J., dissenting) with *Morales*, 527 U.S. at 53 (Stevens, J., plurality, and O'Connor J., concurring)).

*also Morales*, 527 U.S. at 77-80 (Scalia, J., dissenting) (noting that other than in the free-speech cases subject to the overbreadth doctrine, facial challenges are not allowed, citing *Salerno*, discussing precedent).[24]

The plurality in *Morales* specifically rejected Justice Scalia's argument, however, noting that the *Salerno* proposition was dictum, and ruled that since the case *sub judice* came from a state court, and not a federal court, it need not resolve the viability of *Salerno's* dictum. *Morales*, 527 U.S. at 55 n.22.[25] The plurality ruled that it did not need to

---

[24] As one commentator has observed,
If *Salerno* really set forth the governing standard, however, litigants would rarely bring facial challenges. In an as-applied challenge, if the statute in question cannot be constitutionally applied to the litigant, then she will prevail without having to show that no set of circumstances exists under which the statute could be constitutionally applied to someone else. On the other hand, if the litigant loses her as-applied challenge, she will also lose her facial challenge under *Salerno* because the statute is constitutional in at least one circumstance. In short, a litigant can prevail on a facial challenge only if she can also prevail on an as-applied challenge, and even then she may lose the facial challenge. Under *Salerno*, a litigant bringing a facial rather than an as-applied challenge gains nothing.
Dorf, *Facial Challenges to State and Federal Statutes,* 24 Stan. L.Rev. 235, 239 (January 1994).

[25] Footnote 22 provides:
The burden of the first portion of Justice' SCALIA's dissent is virtually a facial challenge to the facial challenge doctrine. . . . He first lauds the "clarity of our general jurisprudence" in the method of our assessing facial challenges and then states the clear import of our cases is that, in order to mount a successful facial challenge, a plaintiff must "establish that no set of circumstances exists under which the Act would be valid." . . . *United States v. Salerno*, 481 U.S. 739, 745 . . . (1987). *To the extent we have consistently articulated a clear standard for facial challenges, it is not the Salerno formulation, which has never been the decisive factor in any decision of this Court, including Salerno itself (even though the defendants in that case did not claim that the statute was unconstitutional as applied to them, see id. at 745, n.3, . . . the Court nevertheless entertained*

it was not.  The district court's opinion must be reversed on this basis.

## D. Facial Due Process Challenge

In *White*, the Michigan Court of Appeals rejected the defendant's facial challenge to the stalking statute on vagueness grounds.  *See White*, 536 N.W.2d at 884.   The district court stated that while a facial attack was clearly available to Petitioner on First Amendment grounds, the issue was less clear whether Petitioner could mount a facial attack on due process grounds.  The court decided that, "[a]lthough the case law on the question is unsettled, the Court believes that Staley's due process arguments warrant a facial analysis of the statute." *See Staley*, 108 F. Supp. 2d at 782.  The court also concluded that the statute was vague. *See id.* at 786 n.4.

Respondent asserts that the *White* court's rejection of the defendant's facial due process challenge did not violate clearly established Supreme Court precedent, since at the time of Petitioner's appeal, a facial challenge was not recognized on other than First Amendment grounds.   In support, Respondent cites *United States v. Salerno*, 481 U.S. 739, 745 (1987).[23]   In *Salerno*, the Supreme Court stated that to mount a successful facial challenge outside of the First Amendment, a party must "establish that no set of circumstances exists under which the [statute] would be valid." *Id.* at 745.   *See*

---

[23]The *White* court did not cite *Salerno*.  It is clear, however, that it applied the principle of *Salerno*.  In its discussion of the void-for-vagueness doctrine, the *White* court stated in pertinent part: "'In determining the sufficiency of the notice a statute must of necessity be examined in the light of the conduct with which a defendant is charged.'" *Id.* (quoting *United States v. National Dairy Prods. Corp.*, 372 U.S. 29, 33 (1983)).  Thus, in conducting a facial analysis of vagueness grounds under due process, the *White* court necessarily took into account the defendant's conduct. *See also id.* ("Applying the law to the facts of this case, we believe that the stalking statutes provide fair notice of the prohibited conduct.")  As Justice Scalia noted in his dissent in *Morales*, the *Salerno* principle did not originate there, "but has been expressed in a line of prior opinions," citing, *inter alia*, *National Dairy Prods.  See Morales*, 527 U.S. at 79-80 (Scalia, J., dissenting).

in relevant part that "[b]oth § 411h(1)(c) and § 411i(1)(d) state that '[h]arassment does not include constitutionally protected activity or conduct that serves a legitimate purpose,' and such protected activity or conduct has been defined as labor picketing or other organized protests." *Id.* at 883 (citation omitted).

From the foregoing language the district court found "clear evidence" that the Michigan Court of Appeals interpreted the meaning of part three of the harassment definition because the *White* court specifically referenced the phrases "constitutionally protected activity" and "conduct that serves a legitimate purpose," "and explained that they have 'been defined as labor picketing or other organized protests.'" *Staley*, 108 F. Supp. 2d at 784 (quoting *White*, 536 N.W.2d at 882).  Thus, the district court concluded that "the *White* court narrowed the meaning of part-three to include only labor picketing or other organized protests." *Id.*

The district court held that although the statute criminalizes conduct and not speech, it infringes upon a substantial amount of conduct that lies at the core of the First Amendment: "If only labor picketing and other organized protests are explicitly excluded from the definition of harassment, the statute is at odds with the First Amendment." *Id.* at 787.  The court cited three examples of First Amendment rights implicated by the *White* court's narrow construction of the terms.  First, are "the rights of the press to investigate issues of public importance." *Id.*  The court remarked that if a reporter was persistent in his efforts to question a juror, which caused the juror emotional distress, and if the juror had a reasonable feeling of harassment or fear, the reporter could be prosecuted under the statute.  *See id.*

Second, the district court observed that "commercial speech is placed in jeopardy as well." *Id.* at 787-88.  The court provided the example of a telemarketer or door-to-door salesman, who could be subject to prosecution for repeatedly soliciting someone. *See id.* at 788.  Third, the court noted that "the rights of ordinary citizens to redress political or legal

grievances is implicated by the statute." *Id.* The court cited as examples the repeated calling of a congressman or the filing of numerous documents with a court clerk. *See id.*

The district court concluded:

These examples illustrate that the *White* court's interpretation of the phrases "constitutionally protected activity" and "conduct that serves a legitimate purpose" is so limited that it allows application of the statute to core First Amendment conduct. This is not to say that the statute necessarily makes protected conduct illegal or that individuals engaging in this conduct are certain to be prosecuted or convicted. Instead, the vagueness of the statute chills the exercise of First Amendment freedoms because it potentially subjects those who exercise these rights to criminal prosecution. *See Broadrick*, 413 U.S. at 612-13, 93 S.Ct. 2908 ("[the overbreadth doctrine relies upon the] assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression"). The state of Michigan may certainly criminalize stalking, but it may not do so at the expense of the First Amendment. *See id.* ("[the overbreadth doctrine is predicated on the idea that] the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted and perceived grievances left to fester because of the possible inhibitory effects of overly broad statutes").

*Id.* The court therefore held that the statute violated the First Amendment because it is overbroad. *See id.*

Respondent appeals, arguing that the district court erred in allowing Petitioner to mount a facial attack to a state statute on habeas since the statute is constitutional as applied to his conduct. Respondent also contends that the district court misinterpreted the controlling state precedent. Third, he maintains that the state court's rejection of Petitioner's facial challenge on First Amendment grounds was not an

We consider this the paradigmatic case of a state statute whose legitimate reach dwarfs its arguably impermissible applications. New York, as we have held, may constitutionally prohibit dissemination of material specified in § 263.15. While the reach of the statute is directed at the hard core of child pornography, the Court of Appeals was understandably concerned that some protected expression, ranging from medical textbooks to pictorials in the National Geographic would fall prey to the statute. How often, if ever, it may be necessary to employ children to engage in conduct clearly within the reach of § 263.15 in order to produce educational, medical, or artistic works cannot be known with certainty. Yet we seriously doubt, and it has not been suggested, that these arguably impermissible applications of the statute amount to more than a tiny fractions of the materials within the statute's reach. Nor will we assume that the New York courts will widen the possibly invalid reach of the statute by giving an expansive construction to the proscription on "lewd exhibitions[s] of the genitals." Under these circumstances, § 263.15 is "not substantially overbroad and . . . whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied." *Broadrick v. Oklahoma*, 413 U.S., at 615-616.

*Id.* at 773-74; *see also Osborne v. Ohio*, 495 U.S. 103, 112 (1990) (stating that a statute prohibiting possession of "nude" photographs of minors might not be unconstitutionally overbroad in light of the statute's exemptions and "proper purposes" provisions, in any event, statute was constitutional under state court's construction, which limited operation of statute to lewd depictions of nudity or graphic focus on the genitals).

In summary, the district court ignored § 2254(d)(1)'s mandate to determine merely whether the *White* court's application of *Broadrick* was contrary to, or an unreasonable application of, federal law. Upon review, we conclude that

legitimate reach (and we do not think it did), it cannot be said that the *White* court's application of *Broadrick* was unreasonable. As the Michigan Court of Appeals recognized, the thrust of this statute is proscribing unprotected conduct. Furthermore, any effect on protected speech is marginal when weighed against the plainly legitimate sweep of the statute, and certainly does not warrant facial invalidation of the statute. A comparison with cases in which the Supreme Court has struck down laws on overbreadth grounds makes this clear. *See, e.g., Houston v. Hill*, 482 U.S. 451 (1987) (invalidating on First Amendment facial grounds an ordinance making it unlawful to "interrupt" police officers in performance of their duties); *Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987) (invalidating resolution banning "First Amendment activities" in the airport's central terminal area); *Lewis*, 415 U.S. 130 (invalidating on basis of First Amendment facial challenge ordinance prohibiting "[a]ny person wantonly to curse or revile or to use obscene or opprobrious language toward or with reference to" a policeman while performing his duties); *Gooding*, 405 U.S. 518 (invalidating on First Amendment grounds a statute making it a misdemeanor for any person, without provocation, to use to or of another, and in his presence, "opprobrious words or abusive language, tending to cause a breach of the peace"). Simply stated, it was not unreasonable for the state court to reject Staley's overbreadth challenge.

Although not cited by *White*, the Supreme Court's decision in *Ferber* illustrates why the state court's application of *Broadrick* was not an unreasonable application of federal law. In *Ferber*, the Supreme Court rejected a First Amendment facial challenge to a New York criminal statute that prohibited persons from knowingly promoting sexual performances by children under the age of sixteen, by distributing materials depicting such performances. The New York Court of Appeals invalidated the statute as overbroad because it prohibited the distribution of materials produced outside the state, as wells as medical texts and educational sources. The Supreme Court rejected the facial challenge, stating:

unreasonable application of Supreme Court precedent. Fourth, Respondent alleges that the district court erred in holding that Petitioner's due process arguments warrant a facial analysis of the statute. Finally, Respondent argues that the state court's conclusion that the stalking statute is not void for vagueness was also not an unreasonable application of Supreme Court precedent.

### III. Standards of Review

Section 2254 authorizes a federal court to grant a writ of habeas corpus to state prisoners if they are held "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). This court reviews a district court's decision in a habeas proceeding de novo. *See Harris v. Stovall*, 212 F.3d 940, 942 (6th Cir. 2000).

The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA") governs federal habeas review of the state court judgment. *See id.* Under the AEDPA, the writ may not issue unless the state court adjudication

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (enacted as a part of the AEDPA). Only subsection (d)(1) is directly at issue in this case.

In *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court explained the proper application of § 2254(d)(1). The Court held that a decision of a state court is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially

indistinguishable facts."  *Id.* 120 S.Ct. at 1523.  The Court also held that an "unreasonable application" occurs when "the state court identifies the correct legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.*  A state adjudication is not "unreasonable" "simply because [the federal] court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Id.* at 1522.[6]

## IV. Analysis

### A. Habeas Review of Facial Overbreadth Challenge

The district court held that "Staley's conduct was so abhorrent and harassing that it clearly falls within the zone of conduct that a stalking statute would constitutionally make criminal."  *Staley*, 108 F. Supp. 2d at 784.  The district court nonetheless granted the writ, ruling that the Michigan stalking statute was overbroad because it could hypothetically be applied in an unconstitutional manner.  *See id.* at 788.

Respondent contends habeas relief should not be available to Petitioner because he did not claim that he had engaged in conduct protected by the First Amendment, or that the statute was vague as applied to him.  Respondent contends that First Amendment overbreadth challenges should not be allowed on habeas.[7]

---

[6]In *Nevers v. Killinger*, 169 F.3d 352, 362 (6th Cir.), *cert. denied*, 527 U.S. 1004 (1999), and *Maurino v. Johnson*, 210 F.3d 638, 643-44 (6th Cir. 2000), *cert. denied*, 121 S.Ct. 427 (2000); we adopted the "debatable among reasonable jurists" standard.  The Supreme Court expressly disavowed this standard in *Williams. See Williams*, 120 S.Ct. at 1498; *Harris v. Stovall*, 212 F.3d 940, 942-43 (6th Cir. 2000).

[7]The "great writ of liberty," as it is popularly known, protects individuals "against arbitrary and wrongful imprisonment."  Erwin Chemerinsky, FEDERAL JURISDICTION § 15.1 at 838 (3d ed. 1999) (citing W. Duker, A CONSTITUTIONAL HISTORY OF HABEAS CORPUS , at 3 (1980)).  Yet the availability of federal habeas corpus

---

conduct the statute is designed to deter.[22]  Thus, it was not unreasonable for the Michigan court to decline to apply the "strong medicine" of invalidation on the grounds of overbreadth where *Broadrick* noted that the doctrine "has been employed by the Court sparingly and only as a last resort."  *Broadrick*, 413 U.S. at 613.  As the Supreme Court observed in *Parker v. Levy*, 417 U.S. 733 (1974):

> This Court has . . . repeatedly expressed its reluctance to strike down a statute on its face where there were a substantial number of situations to which it might be validly applied.  Thus, even if there are marginal applications in which a statute would infringe on First Amendment values, facial invalidation is inappropriate if the 'remainder of the statute . . . covers a whole range of easily identifiable and constitutionally proscribable conduct. . . .

*Id.* at 760.  Furthermore, as *Broadrick* stated, whatever overbreadth exists can be cured on a case-by-case basis.  *See Broadrick*, 413 U.S. at 615-16.

In short, even if the state court of appeals wrongly assessed the First Amendment implications in relation to the statute's

---

[22]Furthermore, in providing such examples, the district court ignored the fact that commercial speech is not even protected by the overbreadth doctrine.  *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 496-97 (1982) ("[I]t is irrelevant whether the ordinance has an overbroad scope encompassing protected commercial speech of other persons, because the overbreadth doctrine does not apply to commerical speech.").  It also glossed over the fact that members of the press have "no special privilege to invade the rights of liberties of others," and are not immune from otherwise valid laws that serve substantial public interests, *see Branzburg v. Hayes*, 408 U.S. 665, 682-83 (1972); *see also Cohen v. Cowles Media Co.*, 501 U.S. 663, 669-70 (1991) ("generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news"), and that jurors have a right to be free from harassment by the press.  *See e.g., United States v. Antar*, 38 F.3d 1348, 1363 (3d Cir. 1994); *In re Express-News Corp.*, 695 F.2d 807 (5th Cir. 1982).

Finally, the state court determined that any overbreadth was not substantial, especially when weighed against the state's compelling interest in providing law enforcement with the means to intervene in such circumstances before the campaign of harassment escalates to assault or murder. As the *White* court observed, given the exclusions for constitutionally protected activity and conduct that serves a legitimate purpose, "the statute could not be applied to entirely innocent conduct." Thus, in contrast with the district court's more limited definition of these exclusions, the statute expressly attempts to exclude from its coverage any legitimate conduct. Thus, upon review, it cannot be said that the state court's ruling was an unreasonable application of the substantial overbreadth test, as defined by the Supreme Court as defined by *Broadrick*.

Instead of analyzing the state court decision in accordance with the dictates of § 2254(d) and *Williams*, the district court stated: "The Court must determine the proper legal standards to apply to Staley's First and Fourteenth Amendment challenges. . . . [I]n the instant case, the Court will conduct a facial analysis to determine whether Michigan's Aggravated Stalking statute violates the First Amendment." *Staley*, 108 F. Supp. 2d at 781. In other words, the district court conducted its own independent assessment of the state statute. Notably, the district court did not identify any Supreme Court case that is directly contrary to the state court decision. It merely simply disagreed with the state court's assessment that the statute is not substantially overbroad, in large part because of the district court's own misinterpretation of *White*.

Granted, the district court posed several examples of speech or expressive conduct that could conceivably be restricted under the statute (although less so under a correct interpretation of *White*). Simply because the district court could cite several examples does not make the statute overbroad, however, especially since none covered the core of

Respondent acknowledges that the United States Supreme Court has reviewed facial overbreadth challenges under § 2254, *see, e.g., Gooding v. Wilson*, 405 U.S. 518 (1972) (holding on habeas that a Georgia statute making it a misdemeanor for any person without provocation, to use in another's presence, "opprobrious words or abusive language tending to cause a breach of the peace" was on its face unconstitutionally vague and overbroad); *Smith v. Goguen*, 415 U.S. 566 (1974) (invalidating on habeas a state law prohibiting treating a flag "contemptuously"; facial challenge), as has this Court. *See Thompson v. Gaffney*, 540 F.2d 251, 253 (6th Cir. 1976) (reviewing petition for writ of habeas corpus attacking disorderly conduct conviction on ground that city ordinance was overbroad; stating that even though the petitioner's words might have been constitutionally prohibited under a narrowly drawn ordinance, "[Petitioner] may still challenge the overbreadth of the ordinance to protect 'the transcendent value to all society of constitutionally protected expression'"); *see also Walker v. Dillard*, 523 F.2d 3 (4th Cir. 1975). *But see Walters v. Clement*, 544 F.2d 1340, 1341 (5th Cir. 1977) (per curiam) (stating that "habeas corpus is a peculiarly unsatisfactory means for attacking a statute on the ground of facial unconstitutionality"); *Thigpen v. Smith*, 603 F. Supp. 1519, 1529-31 (S.D. Ala. 1985) (holding that to "permit[] facial attacks on state statutes to be heard in federal habeas proceedings would be fundamentally inconsistent with the secondary and limited role of such proceedings . . . [and] inconsistent with the adverse impact or prejudice requirement interwoven throughout habeas law"), *vacated on other grounds*, 792 F.2d 1507 (11th Cir. 1986). Respondent

---

relief is an enormously controversial and political issue. *See id.* 838-39 (discussing conservative and liberal perspectives over the proper application of the writ). The debate about the proper scope of habeas relief raises fundamental questions about federalism, separation of powers, the purposes of the criminal justice system, and the nature of litigation. *See id.* at 839; *see also* Erwin Chemerinsky, *Thinking About Habeas Corpus*, 37 Case W. Res. L. Rev. 748 (1978). Respondent's appeal strikes at the heart of this historical debate.

nonetheless contends that merely because the Supreme Court and this Court have assumed the applicability of the facial overbreadth rule in habeas cases, this Court is not precluded from considering the issue because it is squarely raised here. We agree, and we now address the issue. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 63 n.4 (1989) (Supreme Court assumptions on particular legal issues, even on jurisdictional ones, are not binding on future cases that directly raise the question).

In urging us to hold that the district court lacked jurisdiction to review Petitioner's facial challenge, Respondent asserts that "[t]he Supreme Court has not hesitated to reweigh the competing considerations peculiar to cases presented on collateral review, and to reconsider, in that context, the kind of policy considerations that led to the relaxed standing rule in First Amendment cases." In support, Respondent analogizes to *Stone v. Powell*, 428 U.S. 465 (1976), wherein the Supreme Court held Fourth Amendment claims that have been raised and decided in state courts cannot be heard on federal habeas court review. *See id.* at 494 ("where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial").

In reaching this conclusion, the *Stone* Court reasoned that the judicially-created exclusionary rule is designed to deter illegal police practices and does not relate to the accuracy of the fact-finding process. *See id.* at 486, 490-91. Thus, the *Stone* Court reasoned that its application was particularly inappropriate on habeas:

> Application of the rule thus deflects the truthfinding process and often frees the guilty. The disparity in particular cases between the error committed by the police officer and the windfall afforded a guilty defendant by application of the rule is contrary to the idea of proportionality that is essential to the concept of

does not include constitutionally protected activity or conduct that serves a legitimate purpose,' and such protected activity or conduct has been defined as labor picketing or other organized protests. *See Pallas v. Florida*, 636 So.2d 1358, 1360 (Fla. App., 1994) (upholding a similar stalking statute against vagueness challenges). Finally, for aggravated stalking under § 411i(2), there must also be a credible threat to kill another or inflict physical injury against the victim, a family member, or household member, a prior stalking conviction, or actions constituting the offense that are in violation of a restraining order, injunction, or probation order. *Indeed the statute could not be applied to entirely innocent conduct, as defendant suggests.*
   *See Pallas*, supra at 1363.

*White*, 536 N.W.2d at 883 (emphasis added).

The *White* court held that the statute is directly primarily at conduct, not speech, and therefore subject to *Broadrick's* "substantial overbreadth" test for conduct-related statutes. This assessment is not subject to serious debate. The *White* court then identified the legitimate state interests in prohibiting conduct like the Petitioner's. As the *White* court observed:

> Defendant's repeated telephone calls to the victim, sometimes fifty to sixty times a day whether the victim was at home or at work, and his verbal threats to kill her and her family do not constitute protected speech or conduct serving a legitimate purpose, even if that purpose is "to attempt to reconcile," as defendant asserts. The stalking law is aimed at preventing such activity because "[t]he threat of violence, real or perceived, is almost always present in such cases; tragically, it is far from unheard of for a pattern of stalking to end in the stalker killing the stalked."

*White*, 536 N.W.2d 883 (citing House Legislative Analysis, HB 5472 and SB 719, January 4, 1993, which became 1992 P.A. 260 and 261, now § 411h and § 411i, respectively).

*merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.*

*Id.* at 615-16 (emphasis added).

In *Broadrick*, the Court examined a regulation placing restrictions on political campaign activity by public employees, an area which is not considered "pure speech." *See Ferber*, 458 U.S. at 771. The employees made a facial challenge to the statute, arguing that it could be applied to such allegedly protected political expression as the wearing of political buttons or the displaying of bumper stickers. The Supreme Court upheld the statute. The Court acknowledged some overbreadth, but upheld the statute anyway, because the act was "not substantially overbroad" and that whatever overbreadth might have existed "should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly may not be applied." *Id.* at 615-16.

Citing *Broadrick*, the *White* court held:

[N]either §411h nor §411i is overbroad or impinges on defendant's right of free speech under United States and the Michigan Constitutions. . . . *Broadrick v. Oklahoma*, 413 U.S. 601, 613-15 . . . (1973)
. . .
*In the case at bar, the stalking statutes address a willful pattern of conduct, including, but not limited to, following or confronting the victim or calling the victim (i.e. conduct combined with speech)*, that would cause a reasonable person to feel terrorized, threatened, or harassed, and would cause a reasonable person in the victim's position to suffer emotional distress. Section 411h(1)(a)-(d) and 411i(1)(a), (c)-(d). The contact must be initiated or continued without the victim's consent or in disregard of the victim's desire to discontinue the contact. Section 411h(1)(e) and 411i(1)(f). Both § 411h(1)(c) and § 411i(1)(d) state that '[h]arassment

justice. Thus, although the rule is thought to deter unlawful police activity in part through the nurturing of respect for Fourth Amendment values, if applied indiscriminately it may well have the opposite effect of generating disrespect for the law and administration of justice. These long-recognized costs of the rule persist when a criminal conviction is sought to be overturned on collateral review on the ground that a search-and-seizure claim was erroneously rejected by two or more tiers of state courts.

*Id.* at 490-91 (footnotes omitted).[8] The Supreme Court found that the deterrent value of the exclusionary rule was not enhanced by the possibility that "a conviction obtained in state court and affirmed on direct review might be overturned in collateral proceedings often occurring years after the incarceration of the defendant." *Id.* at 493. Nor could it agree that the "overall educative effect of the exclusionary rule would be appreciably diminished if search-and-seizure claims could not be raised in federal habeas corpus review of state convictions." *Id.* Finally, the Court rejected the view that federal habeas corpus review was necessary to protect Fourth Amendment rights because state courts were not "fair and competent forums for the adjudication of federal constitutional rights." *Id.* at 493 n.35.

Thus, in *Stone*, the Supreme Court created an exception to the rule of *Brown v. Allen*, which itself carved out an

---

[8]The *Stone* Court explained:

Resort to habeas corpus, especially for purposes other than to assure that no innocent person suffers an unconstitutional loss of liberty, results in serious intrusions on values important to our system of government. They include "(i) the most effective utilization of limited judicial resources, (ii) the necessity of finality in criminal trials, (iii) the minimization of friction between our federal and state systems of justice, and (iv) the maintenance of the constitutional balance upon which the doctrine of federalism is founded."

*Stone v. Powell*, 428 U.S. 465, 491 n.31 (1976) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 259 (1973) (Powell, J., concurring)).

important exception to collateral estoppel and res judicata for habeas petitions. *See Brown v. Allen*, 344 U.S. 443 (1953) (opinion by Justice Frankfurter) (holding that a constitutional claim may be raised on habeas even though it has been raised and fully litigated in state court).[9] *See also West v. Wright*, 505 U.S. 277, 288 (1992) (noting that "[i]n an influential separate opinion endorsed by a majority of the Court, Justice Frankfurter also rejected the principle of absolute deference to fairly litigated state-court judgments");[10] *Lundy v.*

---

[9] Justice Frankfurter observed that "even the highest State courts have failed to recognize violations" of federal constitutional rights. *Brown v. Allen*, 344 U.S. 443, 511 (1953) (opinion by Justice Frankfurter). He explained:

> The uniqueness of habeas corpus in the procedural armory of our law cannot be too often emphasized. It differs from all other remedies in that it is available to bring into question the legality of a person's restraint and to require justification for such detention. Of course this does not mean that prison doors may readily be opened. It does mean that explanation may be exacted why they should remain closed. It is not the boasting of empty rhetoric that has treated the writ of habeas corpus as the basic safeguard of freedom in the Anglo-American world. 'The great writ of habeas corpus has been for centuries esteemed the best and only sufficient defense of personal freedom.' Chief Justice Chase, writing for our Court, in *Ex parte Yerger*, 8 Wall. 85, 95, 19 L.Ed. 332. Its history and function in our legal system and the unavailability of the writ in totalitarian societies are naturally enough regarded as one of the decisively differentiating factors between our democracy and totalitarian governments.

*Id.* at 512. *But see Stone*, 428 U.S. at 493 n.35 (rejecting view that federal habeas corpus review was necessary to protect Fourth Amendment rights because state courts were not "fair and competent forums for the adjudication of federal constitutional rights").

[10] In *West v. Wright*, 505 U.S. 277 (1992), Justice Thomas, who announced the judgment of the Court, argued against de novo review on habeas corpus. Only Chief Justice Rehnquist and Justice Scalia joined him in this view. The case was ultimately decided on sufficiency of evidence grounds, however. *See id.* at 285-88 (Thomas, J. dissenting) (arguing that "[b]efore 1953 [when *Brown v. Allen* was decided] . . . [a]bsent an alleged jurisdictional defect, habeas corpus would not lie for a [state] prisoner . . . if he had been given an adequate opportunity to obtain full and fair consideration of his federal claim in the state courts"

---

particular mode of expression has to give way to other compelling needs of society." *Id.* at 611-12. As a corollary, the Supreme Court has modified traditional principles to allow litigants "to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Id.* at 612. Therefore, when a statute regulating "only spoken words" is challenged on facial overbreadth grounds, the Court adjudged that the possible harm to society in permitting some unprotected speech to go unpunished, is outweighed by the possibility that protected speech of others may be stifled. *See id.*

On the other hand, "overbreadth scrutiny has generally been somewhat less rigid in the context of statutes regulating conduct in the shadow of the First Amendment, but doing so in a neutral, noncensorial manner." *Id.* at 614. That is, overbreadth scrutiny diminishes as the behavior regulated by the statute moves from pure speech toward harmful, unprotected conduct.

> [T]he plain import of our cases is, at the very least, that facial overbreadth adjudication is an exception to our traditional rules of practice that its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from 'pure speech' toward conduct and that conduct -- even if expressive -- falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct. Although such laws, if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect – at best a prediction – cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe. . . . *To put the matter another way, particularly where conduct and not*

2d at 787, and granted Staley's facial overbreadth challenge. Respondent contends[19] that the district court failed to apply the standard of review contained in the AEDPA; namely that habeas relief is available only if the federal court finds that the state court's decision was unreasonable, not simply erroneous or incorrect. *See Williams*, 120 S.Ct. at 1522.[20]

The issue we must decide then is whether the state courts' rejection of Staley's overbreadth challenge constituted an unreasonable application of federal law, as it existed in 1995-1996. The overbreadth doctrine is well-established. *See Broadrick v. Oklahoma*, 413 U.S. 601 (1973); *Grayned v. City of Rockford*, 408 U.S. 104 (1972) (and citations therein). In *Broadrick*, the Supreme Court explained that the overbreadth doctrine is a limited exception to the traditional standing rule that a person to whom a statute may constitutionally be applied may not challenge that statute on the basis that it may conceivably be applied in an unconstitutional manner to others not before the court.[21] The standing exception for First Amendment challenges is based on the recognition that "the First Amendment needs breathing space and that statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a

---

[19] Amici Curiae Prosecuting Attorneys Association of Michigan and Michigan Domestic Violence Prevention and Treatment Board advance the same argument.

[20] Respondent does not contend that the district court misapplied the "contrary to" prong of § 2254(d)(1).

[21] The *Broadrick* court explained that the standing doctrine reflects fundamental principles of constitutional order -- the personal nature of constitutional rights, and prudential limitations on constitutional adjudication. *See Broadrick v. Oklahoma*, 413 U.S. 601, 610-11 (1973). These principles "reflect the conviction that under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws." *Id.* at 610-611. The limited exception to the standing requirement is justified by "weighty countervailing policies," however. *Id.* at 611 (internal quotation marks omitted).

---

*Campbell*, 888 F.2d 467, 471 (6th Cir. 1989) ("With its decision in *Brown v. Allen*, 344 U.S. 443 . . . (1953), however, the Supreme Court greatly expanded the scope of the federal inquiry on habeas into state court resolution of constitutional questions.").[11]

---

(internal quotation marks omitted)).

[11] The notion that *Brown v. Allen*, 344 U.S. 443 (1953) represents a fundamental change in federal habeas corpus review of state criminal convictions has also been the subject of a longstanding debate. *See, e.g.,* Eric M. Freedman, *Brown v. Allen: The Habeas Corpus Revolution That Wasn't*, 51 Ala. L. Rev. 1542, 1542-43 (2000) ("*Brown v. Allen* has long been the focus of an intense controversy in the history of habeas corpus. . . . [S]ome scholars – in a view that some current Justices accept – argue that the case revolutionized the ability of the federal courts to examine the constitutionality of state criminal convictions, while others assert with equal fervor that the decision 'worked no revolution when it recognized the cognizability on habeas corpus of all federal constitutional claims presented by state prisoners.") (footnotes omitted); Alan Clarke, *Habeas Corpus: The Historical Debate*, 14 N.Y.L. Sch. J. Hum. Rts. 375, 433 (1998). *See* Chemerinsky, *supra*, at 840; *see also* Paul M. Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners*, 76 Harv. L. Rev. 441, 466, 475 (1963) (arguing that federal habeas is a limited remedy, available only when the state courts lack jurisdiction); *and* Gary Peller, *In Defense of Federal Habeas Corpus Relitigation*, 16 Harv. C.R.-C.L.L. Rev. 579, 665-669 (1982) (positing that the federal habeas statute is designed to allow state prisoners a full opportunity to relitigate their constitutional claims in federal court).

In any event, *Brown* has been partially abrogated by § 2254(d) and *Williams v. Taylor*, 529 U.S. 362 (2000). *See Salcedo v. Artuz*, 107 F. Supp. 2d 405, 412 & n.1 (S.D.N.Y. 2000) (observing that "following *Williams*, the power of a federal habeas court to grant a state prisoner's application with respect to claims adjudicated on the merits in state court is sharply circumscribed. . . . Moreover, the standard set forth in *Williams* abrogates the de novo review that was required under *Brown v. Allen*"); *see also Burket v. Angelone*, 37 F. Supp. 2d 457, 465-66 (E.D.Va. 1999) (stating that § 2254(d)(1) abrogates the de novo review required by *Brown*, but that "the review of legal claims is still de novo in the sense that federal courts must independently determine whether the state court decision is correct under federal law"), *appeal dismissed*, 208 F.3d 172, *cert. denied*, 120 S. Ct. 2761 (2000).

Respondent claims that, like the exclusionary rule, the exception to the traditional standing requirement in First Amendment cases is a judicially created rule, not a personal constitutional right. Thus, Respondent argues that applying the exception on collateral review adds little to the protection of First Amendment freedoms, while exacting a significant cost on federal-state relations and the public interest in convicting stalkers such as Petitioner.

As Respondent suggests, the rule allowing facial challenges is a prudential doctrine, not a personal constitutional right. *See Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999) ("When asserting a facial challenge, a party seeks to vindicate not only his own rights, but those of others who may also be adversely impacted by the statute in question. In this sense, the threshold for facial challenges is a species of third party (*jus tertii*) standing, which we have recognized as a prudential doctrine and not one mandated by Article III of the Constitution."). Further, the analogy to the *Stone* rule is inviting, because Petitioner's conduct clearly falls within the zone of conduct a stalking statute could constitutionally prohibit. *Cf. Forsyth County v. Nationalist Movement*, 505 U.S. 123, 129 (1992) (stating that a litigant may challenge a statute by showing that it substantially abridges First Amendment rights even if its application to the litigant would be "constitutionally unobjectionable").

Despite its superficial appeal, this argument must be rejected. Other than the fact that in both situations an admittedly guilty person would escape punishment, *cf. Withrow*, 507 U.S. at 704 (O'Connor, concurring in part, dissenting in part) ("Whether the Court admits it or not, the grim result of applying Miranda on habeas will be, time and time again, the release of an admittedly guilty individual who may pose a continuing threat to society." (internal quotation omitted)), the two doctrines serve different purposes. Admittedly, both rules are prophylactic -- one attempts to deter police misconduct, and the other seeks to prevent the chilling of protected expression. Yet, the exclusionary rule

In short, the district court clearly misread the *White* court's reference to "labor picketing or other organized protests," which as we will discuss, improperly colored its analysis of the overbreadth issue.

Respondent also challenges the district court's conclusion that the statute is vague. The district court stated that had it not found the *White* court's reference to labor picketing and other organized protests so limited the reach of the statute's exemption, it would find the law unconstitutionally vague because the statute provides no guidance as to what constitutes a "legitimate purpose." *Staley*, 108 F. Supp. 2d at 786 n.4.[18]

### C. Overbreadth

Respondent argues that the Michigan Court of Appeals' rejection of Petitioner's claim that the statute is overbroad in violation of the First Amendment was not an unreasonable application of United States Supreme Court precedent. The district court found to the contrary, holding that the stalking law "infringes upon a substantial amount of conduct which lies at the core of the First Amendment," *Staley*, 108 F. Supp.

---

[18]The *White* court defined the term "vagueness" in the following manner:

It is a basic tenet of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. *Michigan State AFL-CIO v. Civil Service Comm. (After Remand), . . .* 528 N.W.2d 811 (1995), citing *Grayned v. Rockford*, 408 U.S. 104, 108 . . . (1972). Our Supreme Court has adopted the following standards for evaluating vagueness challenges:

A statute may be challenged for vagueness on the ground that it
– is overbroad, impinging on First Amendment freedoms, or
– does not provide fair notice of the conduct proscribed, or
– is so indefinite that it confers unstructured and unlimited discretion on the trier of fact to determine whether an offense has been committed.

*White*, 536 N.W.2d at 882-83 (citations omitted).

at 883. Presumably, had the *White* court found that the terms in the exclusion covered only picketing and other organized protests, it would have held that the statute could be applied to entirely innocent conduct. Further, the *White* court rejected the argument that the defendant's harassing phone calls served a legitimate purpose, "to attempt to reconcile," on the grounds that threats of violence are not protected speech, not because the conduct was not labor picketing or other organized protest.

From subsequent opinions it is also apparent that the Michigan Court of Appeals does not perceive *White* as limiting the statutory exemption to apply only to labor picketing and other organized protests. In *People v. Coones*, 550 N.W.2d 600 (Mich. Ct. App. 1996), the Michigan Court of Appeals stated that the statutory exemptions have been "defined to include labor picketing and other organized protests." *Id.* at 602 (citing *White* and *Pallas*). There, the defendant argued that he did not harass the victim because he acted with a legitimate purpose – to communicate with his wife and preserve his marriage. The *Coones* court did not reject the defendant's claim on the grounds that the statutory exclusions applied only to labor picketing or other organized protests, but held that the defendant's conduct was illegitimate because it was clearly in violation of the temporary restraining order and the conditions of the defendant's bond.

Similarly, in *People v. Kieronski*, 542 N.W.2d 339 (Mich. Ct. App. 1995), the Michigan Court of Appeals held that the defendant's conduct was not exempted under the harassment definition because, although he may have had legitimate business at the public places at which he threatened his victim, the court could discern no legitimate purpose in approaching or confronting the victim in those places. *See id.* at 343. Had the statutory exemptions been limited by *White*, as the district court found, there would have been no reason for the *Kieronski* court to discuss whether the defendant's behavior was exempted.

seeks to remedy a discrete, past violation, and to send a message to police officers in the process.

The overbreadth doctrine, on the other hand, is prospective. Its purpose is to prevent the chilling of future protected expression. *See New York v. Ferber*, 458 U.S. 747, 768 (1982) ("persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions by a statute susceptible of application to protected expression" (internal quotation omitted)). Its value would therefore not be diminished on habeas. Further, it is intentionally broad in scope. "Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society – to prevent the statute from chilling the First Amendment rights of other parties not before the court." *Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984). For this reason, any sense of injustice created by the windfall to a guilty defendant is vastly outweighed by the benefit to society in protecting the right to free expression. Thus, the balance struck in the First Amendment overbreadth context is vastly different than that struck in *Stone*, and not inconsistent with "the idea of proportionality that is essential to the concept of justice." *Stone*, 428 U.S. at 490.

The First Amendment occupies hallowed ground in our constitutional jurisprudence. As the Supreme Court has observed, freedom of speech is "delicate and vulnerable, as well as supremely precious in our society." *NAACP v. Button*, 371 U.S. 415, 433 (1963). Given the "transcendent value to all society of constitutionally protected expression," *see Lewis v. New Orleans*, 415 U.S. 130, 133-34 (1974) (citation omitted), it is not improvident to at least entertain such claims on habeas.

Moreover, the Supreme Court has consistently declined to extend *Stone*. *See Jackson v. Virginia*, 443 U.S. 307, 323 (1979) (expressly refusing to extend *Stone* to due-process challenges to the sufficiency of the evidence); *Rose v. Mitchell*, 443 U.S. 545, 559-66 (1979) (refusing to extend

*Stone* to equal protection claim in selection of a grand jury); *Kimmelman v. Morris*, 477 U.S. 365, 382-83 (1986) (holding that a Sixth Amendment claim of ineffective assistance of counsel could be relitigated on habeas corpus, even though the attorney's error was failure to raise Fourth Amendment objections in the state courts); *Withrow v. Williams*, 507 U.S. 680, 691 (1993) (refusing to extend *Stone* to *Miranda* claims raised on habeas; stating that "'[p]rophylactic' though it may be, in protecting a defendant's Fifth Amendment privilege against self-incrimination, *Miranda* safeguards a fundamental *trial* right"). *Cf. Reed v. Farley*, 512 U.S. 339 (1994) (noting that the Court has repeatedly declined to extend the rule in *Stone* beyond its original bounds; deciding Interstate Agreement on Detainer Act speedy trial claim on state grounds); *Withrow*, 507 U.S. at 700 (O'Connor, concurring in part and dissenting in part) ("only once has this Court found that the concerns of finality, federalism, and fairness supported" excluding certain types of claims from habeas review). This Court has also been reluctant to extend *Stone*. *See DeLisle v. Rivers*, 161 F.3d 370, 380 (6th Cir. 1998) (en banc), *cert. denied*, 526 U.S. 1075 (1999) (summarily rejecting the argument that the sufficiency of the evidence and impartiality of the jury claims are not reviewable on habeas, stating that: "The United States Supreme Court has explained that *Stone* was a prudential decision, based in large part on the fact that the exclusionary rule is not a personal constitutional right, and it has repeatedly declined to extend the rule in *Stone* beyond its original bounds" (internal quotation marks omitted)).

Finally, in *Stone* itself, the Court stressed that its decision restricted the exclusionary rule, not the scope of § 2254 in general.

> Our decision today is *not* concerned with the scope of the habeas corpus statute as authority for litigating constitutional claims generally. We do reaffirm that the exclusionary rule is a judicially created remedy rather than a personal constitutional right, . . . and we emphasize the minimal utility of the rule when sought to

interpretation, the district court concluded that these phrases rendered the statute unconstitutionally overbroad in violation of the First Amendment. *See id.* at 788. The court then posited various situations in which the stalking statute might be applied in a manner at odds with the First Amendment. *See id.* at 787-88.

As Respondent contends, there is no indication that the *White* court's reference to labor picketing and other organized protests were the *only* activities excluded by the limiting language. In fact, the portion of the *Pallas* opinion *White* refers to is simply a quotation of that state's exemption in its stalking law: "Constitutionally protected activity is not included within the meaning of 'course of conduct.' Such constitutionally protected activity includes picketing or other organized protests." *Pallas*, 636 So. 2d at 1360 (quoting Fla. Stat. § 784.048(1)(a)-(c)(Supp. 1992)). The Florida statute does not limit the term "constitutionally protected activity." Rather, it expressly states that "such constitutionally protected activity *includes* picketing or other organized protests." *Id.* (quoting the Florida statute). Thus, the statutory language indicates that the list is illustrative, not exhaustive. *See also Bouters v. State*, 659 So. 2d 235, 237 (Fla. 1995) (holding that Florida stalking statute was neither unconstitutionally overbroad nor unconstitutionally vague; observing that "[t]he conduct described at length in the stalking statute is clearly criminal and is unprotected by the First Amendment"), *cert. denied*, 516 U.S. 894 (1995).[17]

In addition, it is apparent that the *White* court also read the terms as illustrative not exhaustive, because, in its overbreadth analysis, it concluded that "the statute could not be applied to entirely innocent conduct." *White*, 536 N.W.2d

---

said about these phrases, their meaning is clear and definite." *Staley*, 108 F. Supp. 2d at 786.

[17] The Florida Supreme Court subsequently approved of the appellate court decision in *Pallas*, based on *Bouters v. State. See Pallas v. State*, 654 So.2d 127 (Fla. 1995).

(holding that United States Supreme Court lacks jurisdiction authoritatively to construe state legislation).

The Michigan Court of Appeals in this case summarily rejected Staley's overbreadth challenges based on that court's earlier decisions, including *White, supra.*[15]    In *People v. White*, the Michigan Court of Appeals noted that "[b]oth § 411h(1)(c) and § 411(i)(1)(d) state that '[h]arassment does not include constitutionally protected activity or conduct that serves a legitimate purpose,' *and such protected activity or conduct has been defined as labor picketing or other organized protests.*" *White*, 536 N.W.2d at 883 (citing *Pallas v. Florida*, 636 So.2d 1358, 1360 (Fla. Ct. App. 1994) (emphasis added)).

As noted, the district court held that the *White* court's reference to labor picketing or other organized protests was a deliberate statement by the state court that only those activities are exempted from the definition of harassment. *See Staley*, 108 F. Supp. 2d at 784.[16]    Based on this

---

[15]The Michigan Court of Appeals decision, which is unpublished, provides in relevant part:

> There is no merit to defendant's claim that the stalking statute unconstitutionally shifts the burden of proof and is unconstitutionally vague and violative of double jeopardy protections. *People v. Cooner* [sic], – Mich App – ; – NW2d – (1996)(#166114, rel'd 5-21-96); *People v. White*, 212 Mich App 298; 535 NW2d 876 (1995); *People v. Ballantyne*, 212 Mich App 628; 538 NW2d 106 (1995).

*State v. Staley*, No. 178555 (Mich. Ct. App. Aug 20, 1996) (unpublished per curiam).  The analysis in this case therefore examines the relevant Supreme Court precedent in 1995 and 1996, when *White* and the Michigan Court of Appeals opinion in the case *sub judice* were written, respectively.   In general, future references will be to the *White* court opinion, which details the reasoning for rejecting vagueness and overbreadth challenges to the stalking statute, since there appears to be little material change in the applicable precedent in 1995-1996.

[16]Given this conclusion, the district court rejected Staley's argument that these phrases are so unclear that they fail to satisfy the notice requirement of the Due Process Clause because "whatever else may be

---

be applied to Fourth Amendment claims in a habeas corpus proceeding."

Stone, 428 U.S. at 494, n. 37 (citation omitted). [12]

For all these reasons, we decline to hold that First Amendment overbreadth challenges are not reviewable on habeas.

The State also argues that the language of the federal habeas corpus statute, 28 U.S.C. § 2254, refutes the notion

---

[12]In fact, as Justice Scalia recognized in his dissenting opinion in *Withrow*:

> By statute, a federal habeas court has jurisdiction over any claim that a prisoner is "in custody in violation of the Constitution or laws" of the United States.  *See* 28 U.S.C. §§ 2241(c)(3), 2254(a), 2255.  While that jurisdiction does require a claim of legal error in the original proceedings, *cf. Herrera v. Collins*, 506 U.S. 390 . . . (1993), it is otherwise sweeping in its breadth.  As early as 1868, this Court described it in these terms:
>> "This legislation is of the most comprehensive character.  It brings within the habeas corpus jurisdiction of every court and of every judge every possible case of privation of liberty contrary to the National Constitution, treaties, or laws. It is impossible to widen this jurisdiction." *Ex parte McCardle*, 6 Wall 38, 325-326 . . . (1868).
>
> Our later case law has confirmed that assessment.  Habeas jurisdiction extends, we have held, to federal claims for which an opportunity for full and fair litigation has already been provided in state or federal court, *see Brown v. Allen*, 344 U.S. 443, 458-459 . . . (1953); *Kaufman v. United States*, 394 U.S. 217, 223-224 . . . (1969), to procedurally defaulted federal claims, including those over which this Court would have no jurisdiction on direct review, *see Fay v. Noia*, 372 U.S. 391, 426, 428-429 . . . (1963); *Kaufman, supra*, at 223, . . . *Wainwright v. Sykes*, 433 U.S. 72, 90-91, . . .(1997); *Coleman v. Thompson*, 501 U.S. 722, 750 . . . (1991); and to federal claims of a state criminal defendant awaiting trial, *see Ex parte Royall*, 117 U.S. 241, 251, . . . (1886).

*Withrow*, 507 U.S. at 715-16 (Scalia, concurring in part and dissenting in part).

that a habeas corpus action may be advanced on the basis of hypothetical situations. Specifically, § 2254(e)(2) includes the phrase "the factual basis of a claim" and § 2254(e)(2)(B) includes the phrase "the facts underlying the claim." *See also* 28 U.S.C. § 2244(b)(2)(B)(i) ("the factual predicate for the claim"); § 2244(b)(2)(B)(ii) ("the facts underlying the claim"). Finally, Respondent notes that in *Williams*, the Supreme Court concluded: "For now it is sufficient to hold that when a state-court decision unreasonably applies the law of this Court *to the facts of a prisoner's case*, a federal court applying § 2254(d)(1) may conclude that the state-court decision falls within the provision's 'unreasonable application' clause." *Williams*, 120 S.Ct. at 1521 (emphasis added).

As Petitioner points out, *Williams* did not involve a facial challenge to a state statute. At issue was whether the defendant's attorney had provided ineffective assistance of counsel during the penalty phase of a capital case, which is necessarily a fact intensive issue. Nothing in the opinion suggests that the single sentence extracted by Respondent was intended to have the broad meaning the State has ascribed to it.

Furthermore, the language of the governing statute, 28 U.S.C. § 2254(d)(1), as enacted in the AEDPA, does not speak in terms of application of law to facts; it speaks in terms of the unreasonable application of clearly established Federal law.[13] More importantly, as the Supreme Court observed in *Williams,* "§ 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court," namely that the state-court adjudication must be contrary to, or an unreasonable application of, clearly established Supreme

---

[13]Section § 2254(d)(2), speaks in terms of "an unreasonable interpretation of the facts in light of the evidence presented" in state court. 28 U.S.C.A. § 2254(d)(2). This subsection of the statute is not at issue in this case.

Court precedent. *Id.* at 1523. Significantly, the AEDPA, which substantially changed many aspects of federal habeas jurisprudence, narrowed the scope of federal court review,[14] but did not ban outright any type of constitutional claim. Had Congress wanted to limit certain species of federal constitutional challenges on habeas, it could easily have done so in the AEDPA. *See generally Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 185 (1988) (Congress is presumed to know "about existing law pertinent to the legislation it enacts"). That Congress did not is telling.

Respondent's stringing together of references "to the facts" from various sources is unpersuasive. Although the AEDPA has imposed new restrictions on federal habeas, we can find no authority in the legislative history or the case law for the proposition that the AEDPA intended to prohibit facial challenges on habeas. We therefore reject Respondent's invitation to prohibit facial challenges on habeas.

### B. State Court Construction of Stalking Statute

Respondent contends that the district court's overbreadth analysis is based upon an erroneous conclusion that the Michigan Court of Appeals narrowed the statutory exemptions to include *only* labor picketing and other organized protests. "'In evaluating a facial challenge to a state law, a federal court, must, of course, consider any limiting construction that a state court or enforcement agency has proffered.'" *Kolender v. Lawson*, 461 U.S. 352, 355 (1983) (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 494 n.5 (1982)); *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972); *see also Johnson v. Fankell*, 520 U.S. 911, 916 (1997) ("Neither this Court nor any other federal tribunal has any authority to place a construction on a state statute different from the one rendered by the highest court of the State."); *Gooding*, 405 U.S. at 520

---

[14]*See supra*, note 11.