*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0426P (6th Cir.)
File Name: 02a0426p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

THERRESSA JOLYNN RITCHIE,
   *Petitioner-Appellant,*

   *v.*        No. 01-3737

SHIRLEY ROGERS, Warden,
   *Respondent-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 99-00058—Michael R. Merz, Magistrate Judge.

Argued: September 20, 2002

Decided and Filed: December 18, 2002

Before: KENNEDY and MOORE, Circuit Judges; DOWD,*
Senior District Judge.

_____

**COUNSEL**

**ARGUED:** Theresa G. Haire, PUBLIC DEFENDER'S
OFFICE, Columbus, Ohio, for Appellant. M. Scott Criss,
OFFICE OF THE ATTORNEY GENERAL,

_____

 *The Honorable David D. Dowd, Jr., Senior United States District
Judge for the Northern District of Ohio, sitting by designation.

1

CORRECTIONS LITIGATION SECTION, Columbus, Ohio, for Appellee. **ON BRIEF:** Theresa G. Haire, David H. Bodiker, PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant.   M. Scott Criss, OFFICE OF THE ATTORNEY GENERAL, CORRECTIONS LITIGATION SECTION, Columbus, Ohio, for Appellee.

––––––––––––––

**OPINION**

––––––––––––––

### I.  INTRODUCTION

DOWD, Senior District Judge.  This is an appeal from the denial of petitioner's action under 28 U.S.C. § 2254 seeking habeas relief from her Ohio state conviction in Montgomery County Common Pleas Court for the murder of her 4-year-old daughter.  On July 18, 1995, petitioner made a 911 call to report her daughter missing.  The report set off a massive search by many volunteers in the Dayton community where petitioner and her daughter lived.  Several days later, on July 22, 1995, search dogs discovered the missing daughter's body in a pool of water in a nearby foundry.  Intense publicity accompanied the search, subsequent discovery of the body, and the child's funeral.  Grief turned to public scorn when, approximately two weeks after the initial report of the missing child, petitioner was first charged with involuntary manslaughter and ultimately indicted for the murder of her child.

On August 3, 1995, the Dayton Police Chief announced that petitioner had confessed to the killing.  Subsequently, petitioner's boyfriend pled guilty to related charges and it was publicly disclosed in the guilty plea colloquy that petitioner killed the child after the child wandered into the room where petitioner and the boyfriend were engaged in sexual relations.

The continuing publicity concerning the story of the child's murder was massive.  At the end of 1995, *Dayton Daily*

After careful review, we find that the state courts' denial of petitioner's motion for change of venue and rejection of petitioner's objections, based on the impact of pre-trial publicity, to the switch from individual voir dire to group voir dire neither "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law" nor "resulted in a decision that was based on an unreasonable determination of the facts."

## V.  CONCLUSION

Finding no merit in either of petitioner's claims, the judgment of the district court denying the writ of habeas corpus is AFFIRMED.

*News*, the principal newspaper in Dayton, called the homicide story the Number 1 news story for that calendar year.

On January 12, 1996, just seventeen days before the jury voir dire commenced, petitioner's counsel supplemented an initial motion for change of venue.[1] Citing *State v. Herring*, 21 Ohio App.3d 18 (1984), petitioner, while conceding that a careful and searching voir dire provides the best test for determining whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality, submitted considerable material in support of her claim that the trial court should review the pretrial publicity to determine whether it "was so pervasive and prejudicial that an attempt to seat a jury would  be a vain act."[2]  The trial court did not

---

[1] The joint appendix contains many copies of newspaper articles addressing the search for and discovery of Samantha Ritchie's body, the subsequent arrest of petitioner, the arrest of petitioner's boyfriend and his admission of guilt, as well as the saturation of interest in the entire episode by both televison and print media.  However, the joint appendix did not disclose to what extent the materials therein had been brought to the attention of the trial judge.  At oral argument, the panel questioned what media coverage materials had actually been submitted to the trial court in support of the motion for change of venue.  In response to the panel's questions and directions, on October 3, 2002, petitioner filed a certified copy of the supplemental memorandum which petitioner's trial counsel had filed on January 12, 1996.  That supplemental memorandum was accompanied by 23 pages of extracts from newspapers, a copy of the transcript of Ritchie's boyfriend's plea of guilty to participating in the events that led to Samantha's killing, and several articles dealing with highly publicized criminal cases.  The extracts included a number of references to the incident in South Carolina where one Susan Smith had reported her children kidnaped after she had caused her vehicle to disappear into a lake with her children strapped inside.  The tragic case of Samantha Ritchie was referred to in the local media as comparable to the Susan Smith case because, like Smith, Ritchie had reported her child missing after she had apparently killed her.

[2] In *Herring*, the Ohio trial court granted a change of venue.  The State appealed and the Ohio Court of Appeals reversed the order, finding that "in the absence of a clear and manifest showing by the defendant that pretrial publicity was so pervasive and prejudicial that an attempt to seat a jury would be a vain act, we hold that in the interest of judicial

rule on the motion to change the venue until after a jury had been seated following the voir dire.

The jury trial began on January 29, 1996 and concluded on February 14, 1996, with convictions of petitioner for murder and additional crimes, resulting in a sentence of 22 years to life. On appeal, the Second District Court of Appeals for Ohio affirmed and the Ohio Supreme Court declined appellate review.

In the district court, petitioner sought habeas relief on the claim that her constitutional right to due process was violated, first, by the state trial court's refusal to change the venue for the trial based on "presumed prejudice" and, second, by the process by which the subsequent voir dire proceedings were conducted. The parties consented to the jurisdiction of a magistrate judge who, on May 30, 2001, denied the petition for a writ, concluding that "[t]he Ohio Court of Appeals' application of controlling Supreme Court precedent to the facts of this case was objectively reasonable." J.A. at 557. Petitioner appealed.

## II.  STANDARD OF REVIEW

A federal court is authorized to grant a writ of habeas corpus to a state prisoner who is held "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). This Court reviews a district court's decision in a habeas proceeding *de novo*. *See Harris v. Stovall*, 212 F.3d 940, 942 (6th Cir. 2000).

The Antiterrorism and Effective Death Penalty Act of 1996, Pub.L.No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), amended federal habeas law by, among other things, changing § 2254(d) of the habeas statute to provide as follows:

economy, convenience, and expense to the taxpayer, that a good faith effort should be made to impanel a jury in this locality." 21 Ohio App.3d at 18.

In a highly publicized case, as this case was, where there is an absence of "presumed prejudice," the trial court has a responsibility to confront the fact of the publicity and determine if the publicity rises to the level of "actual prejudice" and a searching voir dire of the prospective jurors is the primary tool to determine if the impact of the publicity rises to that level. The trial court met the issue head-on and followed the teachings of *Irwin v. Dowd*, *supra*, where the Court observed:

It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression of opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. *It is sufficient if the juror can lay aside his impression or opinion and render a verdict based upon the evidence presented in court.*

*Irwin*, 366 U.S. at 722-23 (emphasis added).

Our review of a state court's decision in a habeas setting is limited by the provisions of 28 U.S.C. § 2254(d) (1) and (2).

change of venue motions include: (1) Michael Jacob Whellan, Note, *What's Happened to Due Process Among the States?  Pretrial Publicity and Motions for Change of Venue in Criminal Proceedings*, 17 AM. J. CRIM. L. 175 (1990); (2) Leslie Renee Berger, Note, *Can the First and Sixth Amendments Co-Exist in a Media Saturated Society?*, 15 N.Y. L. SCH. J. HUM. RTS. 141 (1998); and (3) Joanne Armstrong Brandwood, Note, *You say "Fair Trial" and I Say "Free Press": British and American Approaches to Protecting Defendants' Rights in High Profile Trials*, 75 N.Y.U. L.Rev. 1412 (2000).

center. Using a sharp instrument that he had fashioned at the VDOT shop, Mu'Min murdered and robbed Gladys Nopwasky, the owner of a retail carpet and flooring store. Mu'Min then returned to his prison work crew at the VDOT, discarding his bloodied shirt and the murder weapon near the highway.

*Mu'Min*, 500 U.S. at 418.

After acknowledging that cases dealing with the requirements of voir dire are of two kinds, namely, "those that were tried in federal courts and therefore subject to this Court's supervisory power" and "and those that were tried in state courts, with respect to which our authority is limited to enforcing the commands of the United States Constitution," 500 U.S. at 422, the majority found no error in the trial court's denial of individual voir dire[13] and approved of the trial court's refusal to allow prospective jurors to be questioned about specific contents of news reports.[14]

---

[13]Although *Mu'Min* teaches that individual voir dire is not a constitutional requirement in a highly publicized case, we are of the view that individual voir dire might well avoid some of the problems that develop in a group voir dire setting, in particular when the trial involves a charge of capital murder. *See e.g., State v. Strong*, 119 Ohio App.31, 196 N.E.2d 801 (1963) for an example of the potential hazard involved in group voir dire in a capital case. In *Strong*, during a group voir dire setting in a capital case, a prospective juror, when questioned about her attitude toward capital punishment, indicated that she favored capital punishment in the case at hand because the defendant killed two persons and a dog. The trial court denied the motion to strike the entire jury venire, which in Ohio would have constituted 75 jurors specially drawn for the case, because of the prospective juror's comment. The subsequent capital verdict was set aside because the trial court refused to strike the entire jury venire.

[14]It also rejected the petitioner's reliance on the Standards for Criminal Justice promulgated by the American Bar Association which require individual voir dire "[i]f there is a substantial possibility that individual jurors will be ineligible to serve because of exposure to potentially prejudicial material." *Id.* at 430.
Recent articles addressing fair trials and a free press in the context of

---

(d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Thus, the role of federal courts in the context of habeas review has been significantly modified.

In *Staley v. Jones*, 239 F.3d 769, 775 (6th Cir. 2001), the Sixth Circuit noted:

In *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court explained the proper application of § 2254(d)(1).  The Court held that a decision of a state court is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Id.*, 120 S.Ct. at 1523.  The Court also held that an "unreasonable application" occurs when "the state court identifies the correct legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*  A state adjudication in not "unreasonable" "simply because [the federal] court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 1522.

## III. DID THE MATERIALS SUBMITTED BY THE PETITIONER IN SUPPORT OF A MOTION FOR CHANGE OF VENUE DEMONSTRATE "PRESUMED PREJUDICE"?

Our recent decision in *Nevers v. Killinger*, 169 F.3d 352 (6th Cir. 1999)[3] teaches, in the context of 28 U.S.C. § 2254(d)(1), "that there is clearly established Supreme Court precedent distinguishing between cases involving presumed prejudice--when the 'setting of the trial [is] inherently prejudicial,'--and actual prejudice--when review of both the jury voir dire testimony and the extent and nature of the media coverage indicates 'a fair trial [was] impossible.'" *Id.* at 364 (quoting *Murphy v. Florida*, 421 U.S. 794, 798 (1975)).

The well-known trilogy of "presumed prejudice" cases includes *Irwin v. Dowd*, 366 U.S. 717 (1961), *Rideau v. Louisiana*, 373 U.S. 723 (1963), and *Sheppard v. Maxwell*, 384 U.S. 333 (1966). The opinions in this trilogy did not separate or identify the two concepts of "presumed prejudice" and "actual prejudice." Rather, that distinction was first identified in *Murphy v. Florida*, 421 U.S. 794, 803 (1975).[4]

---

[3] As pointed out by the *Staley* court, and as we discuss *infra*, the "debatable among reasonable jurists" standard adopted by *Nevers*, 169 F.3d at 362, and *Maurino v. Johnson*, 210 F.3d 638, 643-44 (6th Cir. 2000), has been expressly disavowed by the Supreme Court. *See Williams v. Taylor*, 529 U.S 362, 409-413 (2000); *Harris v. Stovall*, 212 F.3d 940, 942-43 (6th Cir. 2000). However, we are relying on *Nevers*, not for its standard of review, but for its discussion of the law relating to pre-trial publicity.

[4] *Murphy*, a habeas corpus case like ours, arose in the Southern District of Florida. As indicated in the opinion, the petitioner relied principally on the above-referenced trilogy of cases and also on *Estes v. Texas,* 381 U.S. 532 (1965). The majority opinion in *Murphy* described those four cases as "state-court conviction[s] obtained in a trial atmosphere that had been utterly corrupted by press coverage." 421 U.S. at 798. In conclusion, Justice Marshall, writing for the majority, stated: "In sum, we are unable to conclude, in the circumstances presented in this case, that petitioner did not receive a fair trial. Petitioner has failed to

---

based on the evidence, no abuse of discretion is shown. *Id.*

We cannot say that the fact that the trial court allowed group questioning of the Category Three and Four jurors was unreasonable or an abuse of discretion. Nor do we find persuasive the argument that group voir dire of those jurors contaminated the pool. Based upon the record, we conclude that Ritchie's right to a meaningful *voir dire* was preserved, and that no prejudice occurred by reason of the method chosen by the trial court for conducting *voir dire*.

J.A. at 554-55.

The Ohio Court of Appeals' reference to *Mu'Min v. Virginia*, 500 U.S. 415 (1991) requires further discussion in the context of highly publicized cases. The *Mu'Min* case presented the issue of whether the petitioner's claim that his Sixth Amendment right to an impartial jury and his Fourteenth Amendment right to due process were violated when the trial judge refused to question prospective jurors about specific contents of news reports to which the jurors had been exposed. The trial judge denied the petitioner's motion for individual voir dire and refused the petitioner's request to ask any of his proposed questions relating to the content of news items that the potential jurors might have seen or read.

Chief Justice Rehnquist, writing for the majority of five justices, described the setting as follows:

Mu'Min was an inmate at the Virginia Department of Corrections' Haymarket Correctional Unit serving a 48-year sentence for a 1973 first-degree murder conviction. On September 22, 1988, he was transferred to the Virginia Department of Transportation (VDOT) Headquarters in Prince William County and assigned to a work detail supervised by a VDOT employee. During his lunch break, he escaped over a perimeter fence at the VDOT facility and made his way to a nearby shopping

In response to the issue of the switch from individual to group voir dire, the Ohio Court of Appeals, in summary, declared:

> We cannot conclude that Ritchie was prejudiced by the trial court's decision to conduct group *voir dire*. The Ohio Supreme Court has held that "neither Ohio nor federal law requires individual voir dire. That issue is within the discretion of the trial judge." *State v. Landrum* (1990), 53 Ohio St. 3d 107, 117, 559 N.E.2d 710. This court has also found group *voir dire* acceptable; we have held that the "desire to conserve time and judicial resources is a reasonable basis for questioning jurors en masse." *State v. Chinn* (Dec. 12, 1991), Montgomery App. No. 11835, unreported, citing *State v. Brown* (1988), 38 Ohio St. 3d 305, 309, 528 N.E.2d 523, *certiorari denied*, (1989), 489 U.S. 1040, 109 S.Ct. 1177, 103 L. Ed. 2d 239. A criminal defendant has no constitutional right to question prospective jurors individually as to the content of news reports to which they have been exposed. *Mu'Min v. Virginia* (1991), 500 U.S. 415, 114 L. Ed. 2d 493, 111 S.Ct. 1899. So long as the trial court is satisfied that prospective jurors can set aside the content of news reports and render a fair verdict

---

A.   The case was also talked about at work, but not in detail. It was more like, did you hear about the child being missing? Afterwards, it was did you hear there was an arrest? That's about the amount of talking that I was involved in at work.

Q.   Okay. Anything else that you recall that you saw on TV about the defendant or that you heard or read, anything specifically?

A.   Most of mine was before the child was found.

Q.   You have no opinion, then, at this time?

A.   No. I can't say that I don't. I'd say I don't have an opinion.

Q.   Thank you.

A.   Sorry.

Q.   That's not a problem.

\* \* \*

J.A. at 770-72.

---

Just two years later, in *Dobbert v. Florida*, 432 U.S. (1977),[5] Associate Justice Rehnquist, relying on *Murphy* and writing for the majority, opined:

> There was, understandably, extensive pretrial publicity concerning several aspects of this case. We accept petitioner's assertion . . . that there was substantial media coverage, including a number of television and radio stories regarding the various aspects of the case.
>
> \* \* \*
>
> Petitioner's argument that the extensive coverage by the media denied him a fair trial rests almost entirely upon the quantum of publicity which the events received. He has directed us to no specific portions of the record, in particular the *voir dire* examination of the jurors, which would require a finding of constitutional unfairness as to the method of jury selection or as to the character of the jurors actually selected. But under *Murphy*, extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair. Petitioner in this case has simply shown that the community was made well aware of the charges against him and asks us on that basis to presume unfairness of constitutional magnitude at his trial. This we will not do in the absence of a "trial atmosphere . . . utterly corrupted by press coverage," *Murphy v. Florida*, *supra*, at 798. One who is reasonably suspected of murdering his children cannot expect to remain anonymous. . . .

---

show that the setting of the trial was *inherently prejudicial* or that the jury-selection process of which he complains permits an inference of *actual prejudice*." *Id.* at 803 (emphases added).

[5] *Dobbert* was convicted of murder in the first degree, murder in the second degree, child abuse and child torture. The victims were his children.

*Dobbert*, 432 U.S. at 301-03.

*Patton v. Yount*, 467 U.S. 1025 (1984) is another decision revisiting the issue of a denied motion for change of venue in an extensive pretrial publicity setting. The defendant, a high school teacher, murdered a female student, but his conviction was reversed by the Pennsylvania Supreme Court. The re-trial started four years later, in the same county and with substantial newspaper coverage, which included the fact that the defendant's confession introduced to obtain his conviction in the first trial had been ruled inadmissible by the Pennsylvania Supreme Court. The Third Circuit, in a habeas setting following Yount's conviction in the second trial, granted the writ, finding that "petitioner had shown that the pretrial publicity had caused actual prejudice to a degree rendering a fair trial impossible." *See Yount v. Patton*, 710 F.2d 956 (3d Cir. 1983).

The Supreme Court reversed in a 6-2 decision[6] and indicated that it had granted certiorari to consider the problem of pervasive media publicity that arises so frequently in the trial of sensational criminal cases. In denying the writ, Justice Powell, writing for the majority, concluded that "the voir dire testimony and the record of publicity do not reveal the kind of 'wave of public passion' that would have made a fair trial unlikely by the jury that was empaneled as a whole." *Yount*, 467 U.S. at 1040.[7]

---

[6] Justice Marshall did not participate.

[7] Justice Stevens' dissent sheds additional light on the record before the Supreme Court as he stated in relevant part:

> The totality of these circumstances convinces me that the trial judge committed manifest error in determining that the jury as a whole was impartial. The trial judge's comment that there was little talk in public about the second trial . . . is plainly inconsistent with the evidence adduced during the *voir dire*. Similarly, the trial court's statement that "there was practically no publicity given to this matter through the news media . . . except to report that a new trial had been granted by the Supreme

A.  Yes.
Q.  And listen to the evidence, watch the witnesses, listen and follow the instructions Judge will give you, and render an opinion completely apart from what you may have read or saw on TV?
A.  Yes, I could.
Q.  Any problem with that at all?
A.  No.
MR. HECK:  Thank you very much.
        * * *

J.A. at 703-05.

MR. CHECK:     Yes.
BY MR. HECK:
Q.  You have heard the parameters. I assume since you are in No. 3, that you have an opinion, but it is not a firmly held opinion.
A.  Yes, sir.
Q.  Where did you read, hear, or see, or get this information?
A.  Television, no particular station, mostly. A little bit of newspapers from the Dayton Daily.
Q.  Do you remember anything specifically that you saw or heard?
        * * *
A.  I tried to think of this before, you know. This lady just brought up a lot of things I don't remember. I remember a cast, but I don't remember anything about it. As far as what she brought up, I don't remember a lot of that.
Q.  Again, going through a trial, you may hear things in a trial that you recollect, something that you had heard previously. That is not uncommon in any case. Okay? That is not a problem. Not a problem that you have an opinion. Do you have an opinion in this particular case?
A.  No, I don't think I do. I should say, no, I don't. Think, is not good. But, the reason – you talked to the lady about television, believing. Television and newspapers, I like to read and see TV about stories, but as far as making my opinions about those stories, I like to get a little more facts. Sometimes I don't think you can do that with them. I try to reserve my judgment.
Q.  And the Judge will instruct you that you have to find the defendant guilty or innocent based on what you hear and see in the courtroom.
A.  Yes, sir.
Q.  I presume if you do not have an opinion as to her guilt or innocence, that is not a problem for you, is that correct?
A.  No, it is not.
Q.  Have you talked to anyone else about the case?

put aside their beliefs about petitioner's guilt and decide the case only on the evidence presented in the courtroom.

Petitioner contends that the switch to group voir dire of Category No. 3 jurors, including Smith and Check, constituted a due process violation when the motion to change venue was denied. Petitioner claims that Smith and Check, after listening to which answers led to a jury excusal and which answers resulted in the juror remaining, were conditioned to agree that they could set aside their previously-indicated view that petitioner was guilty and decide the case solely on the evidence presented in the courtroom so as to remain on the jury panel.[12]

---

[12]The questions and answers of jurors Smith and Check who were questioned during the voir dire, follows:

BY MR. HECK:
Q. Mrs. Smith.
A: Miss.
Q. Miss Smith. Again, Category Three, which is you have an opinion but it is not firmly held, is that correct?
A. Yes.
Q: Where did you get your information from?
A. Channel 7 and some of the Dayton Daily.
Q. And I am going to ask you, did you speak to any of your friends or co-workers or anything like that?
A. Co-workers.
Q. And did they have opinions about the case?
A. Yes, they did.
Q. And did they tell you what those opinions were?
A. Yes.
Q. And as a result of what you saw, let me ask you, first, do you remember any specifics of what you saw or read?
A. Just her being found and the cast.
Q. Anything else?
A. No.
Q. Nothing after that?
A. No.
Q. Nothing recently, in the last week or two?
A. No.
Q. And as a result of that, did you reach an opinion as to the guilt or innocence of the defendant?
A. Well, I thought she was guilty.
Q. And I am going to ask you, can you put that aside?

---

In the instant case, the trial court did not speak to the issue of "presumed prejudice" even though the motion for change of venue set forth the materials that supported our brief summary of the intensive and focused publicity on the culpability of petitioner after the search, funeral and revelation that the mother who had reported the child missing was, in fact, the killer. Rather, the district court proceeded on the basis that this case presented an issue of "actual prejudice" and then established a focused voir dire process to determine if "actual prejudice" existed.[8]

---

Court," . . . simply ignores at least 55 front-page articles that are in the record. . . . Further, the trial judge's statement that "almost all, if not all, [of the first 12] jurors . . . had no prior or present fixed opinion," . . . is manifestly erroneous; a review of the record reveals that 5 of the 12 had acknowledged either a prior or a present opinion. . . . The trial judge's "practically no publicity" statement also ignores the first-trial details within the news stories. These included Yount's confessions, testimony, and conviction of rape – all of which were outside of the evidence presented at the second trial. . . . Under these circumstances, I do not believe that the jury was capable of deciding the case solely on the evidence before it. *Smith v. Phillips*, 455 U. S. 209, 217 (1982) ("Due process means a jury capable and willing to decide the case solely on the evidence before it").

*Yount*, 467 U.S. at 1047-48 (Stevens, J., dissenting) (internal citations omitted).

[8]The Ohio trial court, in its written order denying the motion for change of venue, stated in relevant part:

As stated on the record on January 31, 1996, this Court has considered the matters which were in the motion for change of venue. After such consideration, this Court believes that the prospective jurors have expressed honestly and fairly their feelings about the case in light of pretrial publicity. The Court credits each juror with the veracity of their statements under oath and is convinced that they can accord this Defendant the presumption of innocence and that they do not presume guilt. Although many of the jurors did convey that they had formed an opinion based on media prior to coming to court, many also convinced this Court that they could set that opinion aside and

The district court's decision denying the writ carefully analyzed the importance of *Williams v. Taylor*, 529 U.S. 362 (2000), which replaced the analysis in *Nevers v. Killinger, supra*, and held that the "contrary to" and "unreasonable application of" clauses in § 2254 (d)(1) are to be given independent meaning.[9]   A state decision is "contrary to" Supreme Court precedent if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite the Supreme Court's.  529 U.S. at 405-06.

*Williams* teaches that an "unreasonable" application is different from an incorrect one.  As indicated by the district court, "[u]nder § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes  that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."[10]  J.A. at 543-44.

---

place into effect the presumption of innocence which is required under the law.

J.A. at 33-34.

[9]The majority's decision in *Williams* as it relates to the test set forth in § 2254(d)(1) was written by Justice O'Connor in Section II of her opinion.

[10]*Williams* further provides:

   Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

529 U.S. at 413.

received or particularly that you recall having received from any news media sources.

   * * *

   Again, let me repeat.  Any prospective jurors who have opinions about whether the defendant is guilty or not guilty of the offense that have been derived from news accounts or any other source that may have come to them that cannot set these opinions aside and perform as a fair, unbiased, unprejudiced juror in this case? Okay. Subject to the one exception then, we are going to bring groups of 14 of you into the box and allow counsel to proceed to question you individually.

J.A. at 755-757.

   Once the group voir dire of jurors in Category No. 3 began, all the jurors were questioned in a group setting.  Each such juror, when questioned in a group setting, indicated a belief that the defendant was guilty or probably guilty.  Further questioning by the court followed, with the result that Category No. 3 jurors who indicated an inability to set aside the opinion of guilt and decide the case only on the evidence presented during the trial were excused without exception.  However, when a Category No. 3 juror indicated a willingness and ability to decide the case only on the evidence presented in court, those jurors were not excused.  Eventually, the jurors who declared themselves to be in Category No. 4 were questioned individually and all jurors in that Category were excused.  After the initial voir dire process was completed as to the effect of the pre-trial publicity, Category No. 2 jurors became involved in the balance of the voir dire process.

   Each side used their allotted four peremptory challenges.  The twelve jurors that remained, according to respondent and with no dispute from petitioner, included four Category No. 3 jurors, Brents, Sheldon, Smith and Check.  All four were questioned about the effect of pre-trial publicity, Brents and Sheldon during the individual voir dire, and Smith and Check during the group voir dire.  All four indicated that they could

Subsequently, the trial court, over petitioner's objection, directed that voir dire continue on a group basis. In his explanation for converting from individual to group voir dire, the trial court explained:

THE COURT:    Ladies and gentlemen, we are proceeding, I think, perhaps not quite as rapidly as I had originally anticipated, but we are going in the right direction as far as inquiring of you about your qualifications to serve as jurors in this case. . . .

We are going to, I think efficiency will allow us to inquire of all of you as a group of jurors now on the questions that we want to talk to you about, which will allow us to get to your eligibility for further questioning perhaps a little more efficiently.

In Category Three, each of you, by placing yourself in that category, have classified yourself as being familiar with the case, news accounts, the parties, or the attorneys in some fashion. That the jurors have followed the news accounts and do recall some details of those reports. These are jurors who may have formed or expressed an opinion about whether defendant is guilty or not guilty of the offenses charged, but these opinions are not firmly held.

         * * *

The obligation of the Court and counsel is to inquire of you further, those who are in this category further, to determine the nature of the knowledge or details that you have acquired about this case from whatever source, and also to inquire of you about what opinions you either previously have held or presently hold about whether defendant is guilty or not guilty of these offenses, and, finally, to inquire of you whether or not you can set aside and set out of your mind and lay aside the opinions, particularly the opinions which you may have formed, but also any of the information that you may have

The district court reviewed the state court's applications of law to fact to determine if they were "objectively reasonable." J.A. at 545. The court quoted at length from the decision of the Ohio appellate court which affirmed petitioner's conviction, including the following conclusion of that court with respect to the trial court's challenged denial of the motion for change of venue:

The critical issue to be determined is whether Ritchie's right to a fair trial was violated by the pretrial publicity and the trial court's refusal to change venue. *Ritchie has not established the rare case in which prejudice is presumed.* She has also failed to show that the pretrial publicity interfered with the seating of a fair and impartial jury. Therefore, we cannot say that the trial court abused its discretion by retaining the case for trial in Montgomery County. (Emphasis added).

J.A. at 552 (quoting *State v. Ritchie*, 1997 Ohio App. LEXIS 3421 at *10-23 (1997)).

The district court, in denying the writ with respect to the change of venue issue, emphasized and concluded as follows:

As can be seen, the Ohio Court of Appeals relied for its standards on *State v. Lundgren*, 73 Ohio St. 3d 474, 653 N. E. 2nd 304 (1995); and its own prior decision in *State v. Nobles*, 106 Ohio App. 3d 246, 665 N.E.2d 1137 (1995). This does not evince an attitude of ignoring United States Supreme Court precedent, however. *Lundgren* applied an *Irvin v. Dowd* approach, analyzing the extent of adverse pretrial publicity and the voir dire devoted to uncovering its effects. In *Nobles* the Court of Appeals had also performed an *Irwin v. Dowd* analysis. The Court of Appeals thus applied the correct federal constitutional standards, albeit as reflected in its own precedent and that of the Ohio Supreme Court. Neither *Lundgren* nor *Nobles* is "contrary to" United States Supreme Court precedent.

This Court further concludes that the Ohio Court of Appeals' application of the clearly established federal law was objectively reasonable.

The Court of Appeals recognized that pretrial publicity in this case was pervasive and uniformly adverse to Petitioner. That publicity was undoubtedly fueled by the obvious comparison between this case and that of Susan Smith, a South Carolina mother who drowned her two sons and then claimed they had been adducted [sic]. As a result, the case received extensive local coverage and some statewide and even national attention, a fact which the Court of Appeals recognized. 1997 Ohio App. LEXIS 3421 at *12. It noted that the publicity was not as hostile as that in *Lundgren* (where the County Prosecutor had labeled defendants "inhuman" and predicted they would die in the electric chair), nor did the coverage include details of Petitioner's confession, as had happened in *Nobles*.

J.A. at 555-556.

The district court, acknowledging that the Ohio Court of Appeals did not have the benefit of *Nevers v. Killinger, supra*, compared the level of pretrial publicity in *Nevers* to petitioner's case and concluded:

The Ohio Court of Appeals did not have the benefits of the Sixth Circuit's decision in *Nevers*, but that decision also supports this Court's conclusion. Nevers was a Detroit police officer charged with second degree murder in the death of a person whom he apprehended. The death occurred shortly after the acquittal on state criminal charges of the Los Angeles police officers who beat Rodney King in the course of his arrest. The City of Detroit quickly agreed to $5 million settlement with the estate of the decedent and the Mayor of Detroit stated on national television that the arrestee had been "literally murdered by police." Nevertheless, the court applied the *Irvin v. Dowd* procedure and found that an impartial jury had been seated. Significantly, two jurors challenged for

Petitioner asserts, and respondent does not deny, that none of the prospective jurors who responded to the questionnaire indicated that they were a Category No.1 juror. After the prospective jurors completed their initial classifications, the Category No.2 jurors were sent home because the trial court decided that those prospective jurors would not participate in the "pretrial publicity phase" of the voir dire. J.A. at 787. The Category No. 4 prospective jurors stayed to participate on the limited issue of pretrial publicity. J.A. at 614, 615.

Before moving to group voir dire, the trial court discussed its rationale for individual voir dire by stating:

If you are in Category No. 3 or 4, which I assume the remainder of you are, counsel and the Court are going to proceed to question you individually, out of the presence of the other jurors. This individual voir dire or separate questioning is being conducted because we are going to be asking each of you exactly what it is that you recall viewing, listening to, or reading about pertaining to this case, and what you know or believe you know about it. We will then ask you what, if any, your opinions are and the extent to which they are held.

To make these inquiries in the presence of each other would cause substantial confusion and probable prejudice to the parties because, first of all, people hear, see, and read, and interpret things, and remember things differently, particularly news items, and we don't want one person's recollection of these accounts either adding to or changing what another person's state of the knowledge or impression might be.

Secondly, opinions about whether defendant is guilty or not guilty that are expressed in the presence of other jurors, which opinions are not based on evidence produced in court, could unfairly affect the other potential jurors who either do or do not share those opinions.

Appellant's Br. at 24-25.

That may not be easy.

Appellant's Br. at 21.

Against that background, the state trial court summoned a large number of prospective jurors and asked each one to categorize his or her position in compliance with the trial's court instructions as follows:

Category One, what we are calling Category One, is jurors who are not familiar with this case, or the news accounts, or parties, or attorneys in the case, and have no opinion about whether defendant is guilty or not guilty of the charges.

Category 2 are those jurors who are somewhat familiar with the case, the news accounts, the parties, or the attorneys, and may recall such news broadcasts or news writings but not the details of such, and have no opinion as to whether the defendant is guilty or not guilty of the charges.

Category No. 3 are jurors who are familiar with the case, the news accounts, the parties or the attorneys. These are jurors who have followed the news accounts and recall details of the reports. These are jurors, also, who have formed or expressed an opinion about whether the defendant is guilty or not guilty, but this opinion is not firmly held.

Category No. 4 are jurors who are very familiar with the case, the news accounts, the parties, or the attorneys. They have closely followed the news accounts and have substantial recall of the details of these reports, and these are jurors who have formed or expressed opinions about whether the defendant is guilty or not guilty, and these opinions are firmly held.

J.A. at 725-26.

cause were actually seated on the *Nevers* jury, although the court cited to the Supreme Court's observation in *Beck v. Washington*, 369 U.S. 541, 82 S.Ct. 955, 8 L. Ed. 2nd 98 (1962), that the fact the petitioner in that case did not challenge any of the seated jurors for cause "is strong evidence he was convinced the jurors were not biased..." The facts in *Nevers* were clearly stronger for change of venue than here.

J.A. at 556-57.

Against the backdrop of the restrictive definition of cases demonstrating "presumed prejudice" as set forth in the Supreme Court "trilogy" and our own decision in *Nevers*, *supra*, we hold that the decision of the Ohio Court of Appeals in affirming the trial court's denial of a motion for change of venue based on "presumed prejudice" was neither "contrary to" nor an "unreasonable application of" clearly established Federal law as determined by the Supreme Court. Therefore, we find no error in that same conclusion reached by the district court.[11]

---

[11]An additional problem facing the trial judge, when confronted with a motion for change of venue in a highly publicized criminal case, is whether to determine the "presumed prejudice" issue before or after the voir dire. The trilogy of "presumed prejudice" cases seem to indicate that such a motion should be decided without commencing the voir dire, but the Supreme Court has chosen not to speak directly to that issue. However, as acknowledged in *Nevers*, *supra*, the subsequent decisions in *Murphy*, *supra*, and *Dobbert*, *supra,* dictate that motions for change of venue based on "presumed prejudice" are reserved for those cases where "a trial atmosphere has been utterly corrupted by press coverage." Consequently, as we believe the law has developed, unless the materials submitted to the trial judge demonstrate an utter corruption by the press of the trial atmosphere, the actual voir dire becomes the centerpiece of attention on the motion to change the venue.

## IV. DID THE CONDUCT OF THE VOIR DIRE WHICH RESULTED IN A FINDING OF NO "ACTUAL PREJUDICE" VIOLATE THE DUE PROCESS RIGHTS OF PETITIONER?

When the motion for a change of venue based on extensive pretrial publicity and predicated on "presumed prejudice" fails, the issue of "actual prejudice" remains for review by the trial court to determine whether a review of both the jury voir dire testimony and the extent and nature of the media coverage indicates a fair trial is or is not possible. Adding to the difficulty of handling "actual prejudice" issues is the tension between the due process right of a defendant to a fair and impartial jury and the First Amendment right of the media to report on the proceedings in the context of the approaching criminal trial. The tension is well-documented in both Ohio and federal jurisprudence. In *Dayton Newspapers v. Phillips*, 46 Ohio St. 457 (1976), another sensational homicide case in Montgomery County, the court issued a writ of mandamus prohibiting the Common Pleas Judge assigned the murder case from closing the courtroom to the media during a hearing to suppress the confession of the defendant who was charged with the kidnap murder of a prominent Dayton citizen after a ransom of $400,000 had been paid. In issuing the writ, Chief Justice William O'Neil, writing for the court, declared that, if a fair and impartial trial could not be held, a change of venue should be granted. *Id*. at 468 (citing *Sheppard v. Maxwell*, *supra*; *Irvin v. Dowd*, *supra*; *Rideau v. Louisiana*, *supra*).

*Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976) reached a similar conclusion when faced with the tension between the right to a fair and impartial jury and the First Amendment rights of the media in a highly publicized murder case involving the killing of six members of a family in a small town of 850 people in Nebraska. The media had been restrained from publishing the accounts of confessions by the defendant. The "prior restraint" orders issued to the media were vacated.

In this case, the trial court, obviously aware of the extensive pre-trial publicity, recognized that the actual voir dire would take on great importance in determining whether a fair and impartial jury could be impaneled.

We turn now to a thorough examination of the process by which petitioner's jury was selected.

The pretrial publicity in this case continued; and shortly before the jury selection began, the *Dayton Daily News* published an article, with the headline "Anguish Revisited," reminding the community of the homicide and stating:

The first report on July 19, 1995, that 4-year-old Samantha Ritchie was missing from her Herman Avenue home tugged at the heartstrings of Miami Valley residents.

Hundreds of concerned people converged on the neighborhood that sits in the shadow of the Ohio 4-Webster Street overpass to join the hunt and to console her hysterical mother.

Three days later, their hearts broke when police announced the girl's body had been found submerged in a nearby foundry pit.

And 12 days after that, their hearts burned with rage when police announced Samantha's mother, Therressa Jolynn Ritchie, 24, had been arrested in her daughter's death.

Now, six months after Ritchie's first call for help, she faces that same community and asks it to find her not guilty. Her trial starts Monday.

Before that can happen, Montgomery County Common Please [sic] Judge John Kessler must determine whether it's possible to find 12 jurors capable of setting aside whatever they know about the case and giving Ritchie a fair trial.