NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0224n.06
Filed: March 30, 2006

No. 04-1585

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| BRIAN P. ROBINSON, | ) | |
| | ) | ON APPEAL FROM THE |
| *Petitioner-Appellant*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| DAVID GUNDY, | ) | **O P I N I O N** |
| | ) | |
| *Respondent-Appellee*. | ) | |

BEFORE:     COLE, GILMAN, and FRIEDMAN,* Circuit Judges.

**R. GUY COLE, JR., Circuit Judge.**  Petitioner-Appellant Brian P. Robinson is serving a life sentence in a Michigan prison for the felony-murder of Mary Rook, an elderly woman whom Robinson strangled to death during a burglary.  On May 11, 2004, Robinson petitioned the United States District Court for the Western District of Michigan for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254.  The district court denied the petition and refused to issue a Certificate of Appealability ("COA").  Robinson applied for a COA in this Court; we granted the application with respect to three issues: "the effect of pretrial publicity on the jury, the right to individually *voir dire* the potential members of the jury[,] and the propriety of the use of shackles during his trial."

_____

*Daniel M. Friedman, Senior Circuit Judge for the United States Court of Appeals for the Federal Circuit, sitting by designation.

*Robinson v. Gundy*, No. 04-1585 (6th Cir. Nov. 24, 2004).  For the reasons that follow, we affirm

the judgment of the district court.

## I.

Mary Rook was murdered on March 17, 1996, in her home.  An investigation led to charges

against Robinson and a co-defendant, Samuel Compagnari.  The prosecution alleged that Robinson

strangled Rook with her oxygen tube during a robbery.  He was charged with first degree felony-

murder.  *See* MCL 750.316 (mandatory life sentence for murder committed in the course of, *inter*

*alia*, "larceny of any kind").  Robinson confessed to killing Rook in a taped statement to the police.

While in prison awaiting trial, Robinson also wrote a letter describing the killing, which he gave to

a fellow inmate.  The inmate turned the letter over to Robinson's attorney.  Compagnari was tried

separately.  He was acquitted of first-degree murder but convicted of larceny and being an accessory

after the fact, in violation of MCL §§ 750.360 and 750.505.  *People v. Compagnari*, 590 N.W. 2d

302, 304 (Mich. Ct. App. 1998).

In the eleven months leading up to Robinson's two-day trial on February 18 and 19, 1997,

various events brought the matter to public attention.  First, Judge Joel Gehrke, a state district court

judge who was running for reelection, distributed political flyers that made reference to Robinson.

Specifically, the flyers said:  "The woman [Rook] who was murdered this year was strangled by a

thug who had tried to kill his father with an arrow in the chest in 1992."  Judge Gehrke was referring

to an incident wherein Robinson apparently shot an arrow at this father; Robinson was charged with

attempted murder, but ultimately served a lesser sentence for assault with intent to commit great

bodily harm. This conviction was not admitted at Robinson's trial. Judge Gehrke, who did not preside over any of Robinson's trials, was widely criticized for his remarks. The Michigan Judicial Tenure Commission filed a judicial misconduct complaint against Judge Gehrke in response to his use of the campaign flyers.

Second, approximately twenty-three articles that made reference to Robinson appeared in the *Greenville Daily News*, Montcalm County's only newspaper. Some of the articles repeated Judge Gehrke's comments. Other articles referred to confessions by Robinson, to statements by Compagnari implicating Robinson, and to the prosecutor's pretrial remark that the crime was "horrific" and its perpetrators "animals." The *Greenville Daily News* has a circulation of 10,000; Montcalm County has a population of 54,000. Most of the articles were authored by a single reporter.

At the beginning of his trial, Robinson twice moved for a change of venue. The prosecutor also expressed concern about pretrial publicity, stating that "rather than poison the panel, I think we should consider at least once we get through the preliminary questions, questioning some of the jurors one at a time. What was in the press is so prejudicial and damaging to Mr. Robinson, I would hate to have something said which can't be taken back." The court denied the motions, preferring to determine first whether an impartial jury could be assembled from *voir dire*. Robinson moved for leave to use a diminished capacity defense. This motion was also denied; according to the trial court, diminished capacity cannot be used as a defense to felony-murder in Michigan. The trial court granted several of Robinson's pretrial motions, such as his motion to exclude several witnesses and a series of photographs as prejudicial.

At *voir dire*, the court asked potential jurors a variety of questions. For instance, the court asked whether any potential juror knew Robinson, knew any witness, knew either counsel, or had any relatives in law enforcement. With respect to pretrial publicity, the court asked if any juror had heard anything about the case. When a juror responded in the affirmative, the court asked what the juror had heard. The court then asked whether the juror had formed any belief as to Robinson's guilt or innocence. The court also asked whether the juror could render a fair and impartial verdict after hearing all the evidence. If a juror responded affirmatively to the first question or negatively to the second, the juror was excused. However, several jurors were selected who had read about the case.

Before a juror was selected, the court asked whether either counsel would challenge the person for cause. Neither counsel challenged any juror for cause. However, when defense counsel requested the opportunity to further question a juror who had read about Robinson's trial, the court construed the request as a challenge for cause and denied it. Ultimately, eight of Robinson's twelve jurors had indicated some knowledge of his case. Before the trial began, Robinson's counsel also unsuccessfully challenged the necessity of putting Robinson in shackles. He also requested that the court conduct a more particularized inquiry of those jurors who admitted previous knowledge of the case. Counsel repeated his request for a change of venue. The court denied these requests, but granted defense counsel's request that the jury be sequestered.

At trial, Robinson admitted to killing Rook, but claimed that she was killed accidentally while he was trying to tie Rook's arms behind her back with her oxygen tube. According to Robinson, he told Compagnari that he needed money and Compagnari instructed him to rob Rook in her home. Robinson went to Rook's apartment three times in an attempt to rob her. On his first

trip, Robinson found the door locked, despite Compagnari's assurances that it would be open. After consulting with Compagnari, Robinson returned to Rook's house a second time, carrying a butter knife with which to pry open Rook's door. When Rook saw Robinson as he attempted to open her door, he left. Robinson claims that he explained the events to Compagnari, who "hounded" him to return to Rook's apartment. According to Robinson, he acceded to Compagnari's exhortations and returned to Rook's apartment, using a hammer to break a window and gain entry. Upon entering Rook's home, Robinson attempted to restrain her, using her oxygen tube. In the course of doing so, however, Robinson claims to have accidentally strangled her. In Robinson's words: "I tried to tie her hands up. And next thing you know, she's laying on the floor with her tube around her neck."

In rebuttal, the prosecution played Robinson's taped statement to the police, in which Robinson specifically stated that when he returned to Rook's house the third time, his intention was to kill her. The prosecution also presented the testimony of William Snyder, a Michigan State prisoner who shared a cell with Robinson. Snyder testified that Robinson wrote a letter describing the murder and gave it to Snyder, who in turn gave it to Robinson's attorney. In the letter, Robinson describes "freaking out," wrapping the oxygen tube around Rook's neck, and standing over her as she gasped for air. He comments that "for a little old lady, she sure put a good struggle," and describes pausing on his way out to turn off the oxygen machine. The prosecutor put on various other evidence linking Robinson to the crime, such as hair samples and fingerprints.

Robinson was convicted of felony-murder and sentenced to life in prison without the possibility of parole. His conviction was affirmed by the state court of appeals, and the Supreme

Court of Michigan denied further review. On May 11, 2004, Robinson filed an unsuccessful petition

for habeas corpus relief pursuant to 28 U.S.C. § 2254 in federal district court.

## II.

### A.    Standard of Review

Robinson filed his petition for writ of federal habeas corpus—i.e., his federal law-based

challenge to the legitimacy of his state imprisonment—in May of 2004. This appeal is therefore

governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v.*

*Murphy*, 521 U.S. 320, 326-27 (1997). By enacting the AEDPA, "Congress placed a new restriction

on the power of federal courts to grant writs of habeas corpus to state prisoners," *Williams v. Taylor*,

529 U.S. 362, 399 (2000), such that a federal court cannot grant the writ on a claim adjudicated on

the merits in state court unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1) and (2); *Early v. Packer*, 537 U.S. 3, 7-8 (2000); *Taylor*, 529 U.S. at 412.

The Supreme Court has explicated § 2254(d)(1) as follows:

A state-court decision is "contrary to" . . . clearly established [Supreme Court]
precedent if it "applies a rule that contradicts the governing law set forth in [Supreme
Court] cases" or if it "confronts a set of facts that are materially indistinguishable

> from a decision of [the Supreme] Court and nevertheless arrives at a result different
> from [that] precedent."

*Early*, 537 U.S. at 9 (quoting *Taylor*, 529 U.S. at 405-06). Circuit law is relevant only to the question of whether a law is clearly established; it is not an independent source of federal law. *Hill v. Hofbauer*, 337 F.3d 706, 716 (6th Cir. 2003).

**B.      Pretrial Publicity**

Robinson contends that the pretrial publicity surrounding his case deprived him of a fair trial. Due process requires that a criminal defendant receive a fair trial by an unbiased jury. *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961). The Supreme Court differentiates between two types of jury prejudice: (1) presumed prejudice, whereby the setting of the trial is inherently prejudicial, and (2) actual prejudice, whereby *voir dire* is inadequate to offset extensive and biased media coverage. *See Richie v. Rogers*, 313 F.3d 948, 952 (6th Cir. 2002) (citing *Murphy v. Florida*, 421 U.S. 794, 798 (1975)), *cert. denied*, 540 U.S. 842 (2003). *See also Nevers v. Killinger*, 169 F.3d 353, 362 (6th Cir. 1999), *cert. denied*, 527 U.S. 1004 (1999), *abrogated on other grounds by Harris v. Stoval,* 212 F.3d 940 (6th Cir. 2000).

*1.      Presumed Prejudice*

A court presumes prejudice only in the face of a "trial atmosphere utterly corrupted by press coverage," *see Richie*, 313 F.3d at 952 (quoting *Dobbert v. Florida*, 432 U.S. 282, 303 (1977)), or a "wave of public passion that would make a fair trial unlikely by the jury," *see id.* at 953 (quoting *Patton v. Yount*, 467 U.S. 1025, 1040 (1984)). *See also Murphy*, 421 U.S. at 799 (courts presume

prejudice only where proceedings are "entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of the mob"); *see also id.* (referring to "circus like atmosphere" in Supreme Court's presumed prejudice cases and "a courthouse given over to the public appetite for a carnival").

Robinson does not address the atmosphere of the trial itself, and there is no evidence suggesting that Robinson's trial lacked decorum or solemnity. Moreover, although Robinson characterized the pretrial publicity as "nothing short of a media frenzy aimed at conviction," this characterization is unwarranted. The various newspaper articles are predominantly objective; they express no view as to Robinson's guilt or innocence. *Compare Shepard v. Maxwell*, 384 U.S. 333, 356 (1966) ("[E]very court that has considered this case, save the court that tried it, has deplored the manner in which the news media inflamed and prejudiced the public."). Accordingly, there has been no contradiction or unreasonable application of Supreme Court precedent with respect to presumed prejudice.

2. *Actual Prejudice*

We have said that:

> When the motion for a change of venue based on extensive pretrial publicity and predicated on "presumed prejudice" fails, the issue of "actual prejudice" remains for review by the trial court to determine whether a review of both the jury voir dire testimony and the extent and nature of the media coverage indicates a fair trial is or is not possible.

*Richie*, 313 F.3d at 956.

In this case, the pretrial publicity was extensive. A newspaper with a circulation of 10,000 in a county of 54,000 published 23 articles about Robinson's case in under a year. The articles

contained references to Robinson's confession and to a prior conviction that was not admitted at trial. Moreover, the publicity involved the comments of a prosecutor and, at least until June of 1996, a non-presiding state judge, each of whom might be presumed to have a special influence on a jury. *Cf. Parker v. Gladden*, 385 U.S. 363, 365 (1966) (bailiff's comments carry special weight).

The question before us is accordingly whether, in light of the pretrial publicity and the court's refusal to order a change of venue, the court took adequate steps to empanel an impartial jury. "Qualified jurors need not . . . be totally ignorant of the facts and issues involved." *Murphy*, 421 U.S. at 799-800. Rather, a court must look to the "totality of circumstances" to determine whether there has been actual prejudice. *Id.* at 799. The first circumstance that we examine is *voir dire*. *Cf. id.* at 800; *Richie*, 313 F.3d at 956. Here, the court asked prospective jurors whether they had heard or read of Robinson's case. If a venireperson answered affirmatively, the court asked a series of follow-up questions including whether the individual was influenced by her exposure. If that person acknowledged any bias, she was dismissed. Furthermore, if a juror was selected, the court asked both counsel whether they had any objection for cause.

Robinson argues that this *voir dire* was inadequate and that he was entitled to question prospective jurors individually about the content and effect of their exposure. The Supreme Court has said that a "juror's assurances that he is [not biased] cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate 'the actual existence of such an opinion in the mind of the juror.'" *Murphy*, 421 U.S. at 800. Robinson maintains that he cannot show actual bias without a reasonable opportunity to question those who allegedly hold such a bias.

Although reasonable, this argument is foreclosed by *Mu'Min v. Virginia*, 500 U.S. 415 (1991). In *Mu'Min*, a federal habeas case following a state murder conviction, the pretrial publicity was extensive, consisting of 47 newspaper articles relating to the murder. *Id.* at 418. The articles gave details of the crime scene, included references to the defendant's prior criminal record, and indicated that he had confessed. *Id.* At least one article commented that when the defendant was previously convicted, the death penalty had not been available. As here, the trial court refused to order a change of venue until it could be shown that a local, unbiased jury was impossible to assemble. *Id.* As here, eight of the twelve jurors eventually empaneled had indicated knowledge of the case. *Id.* at 417.

In *Mu'Min*, there were two phases of *voir dire*. Prospective jurors were first collectively questioned about, *inter alia*, pretrial knowledge. If a venireperson acknowledged having heard or read about the case, he was asked if had formed an opinion and whether he could be impartial. Of the sixteen people with prior exposure to the case, one person replied that he could not be impartial and was dismissed. The court then broke the venirepersons into groups of four. The court asked additional questions related to whether the any prospective juror had discussed the case with anyone. If anyone had, the court followed up with questions about their impartiality. One woman equivocated on this point, and was dismissed *sua sponte*. *Id.* at 421.

Before the Supreme Court, the defendant argued that further, individualized inquiry was constitutionally required, and that the trial court was obligated to ask content-based questions of those potential jurors who had heard of the case. The Court noted that its "own cases have stressed the wide discretion granted to the trial court in conducting *voir dire* in the area of pretrial publicity."

*Id.* at 427. The Court noted the difference between *voir dire* in trials "conducted in federal court, and therefore subject to the Court's supervisory power . . . and those that were tried in the state courts, with respect to which authority is limited to enforcing the commands of the constitution." *Id.* at 423. The Court ultimately held that individualized and content-based questions were not constitutionally mandated. *Id.* at 417; *see also Richie*, 313 F.3d at 961-63 ("[T]he majority found no error in the trial court's denial of individual voir dire and approved the trial court's refusal to allow prospective jurors to be questioned about specific contents of news reports.").

Ultimately, Robinson must demonstrate not that the state court's application of Supreme Court precedent was incorrect, but that it was objectively unreasonable. *See Taylor*, 529 U.S. at 410. Alternatively, Robinson must show that his trial resulted in an adjudication that was contrary to Supreme Court precedent. *Id.* The closely analogous facts of *Mu'Min*, as well as its animating principle of deference to state trial courts on the effects of pretrial publicity, foreclose the conclusion in this case that the state court misapplied or contravened Supreme Court precedent.

## C.    Shackling

Robinson asserts that the state court committed constitutional error when it allowed him to remain shackled in the presence of the jury without a specific and sufficient justification. We agree. The Supreme Court held in *Deck v. Missouri* that "the Constitution forbids the use of visible shackles . . . unless that use is justified by an essential state interest—as the interest in courtroom security—specific to the defendant." __ U.S. __, 125 S. Ct. 2007, 2009 (2005). Robinson's trial predated *Deck* and, under the AEDPA, state courts are only held to laws clearly established by the Supreme Court at the time of the alleged violation. *See Taylor*, 529 U.S. at 412. However, the *Deck*

Court was clear that the constitutional ban on routine shackling, at least during the guilt phase of the trial, had been long-established. *See Deck*, 125 S. Ct. at 2010 ("The answer is clear: The law has long forbidden routine use of visible shackles during the guilt phase."); *see also McKaskle v. Wiggins*, 465 U.S. 168, 188 (1984) (a state defendant "may not normally be forced to appear in court in shackles") (citing *Estelle v. Williams*, 425 U.S. 501, 504-05 (1976)); *Lakin v. Stine*, 431 F.3d 959, 963 (6th Cir. 2005) ("[T]he principle that shackling a defendant at trial without the individualized determination as to necessity violates the due process clause was clearly established long before *Deck* was decided.").

Although clearly established as a constitutional violation, the act of routine shackling is subject to review for harmless error. *See Deck*, 125 S. Ct. at 2015; *Lakin*, 431 F.3d at 966. The evidence against Robinson was truly overwhelming. Robinson confessed that he intentionally killed Rook. He confessed again in a written letter, in which he described the murder in detail. Even crediting his trial testimony that he killed Rook by accident while tying her up with her oxygen tube, Robinson still met the elements of felony-murder in Michigan. *See People v. Goecke*, 579 N.W.2d 868, 878 (Mich 1998) (requiring a finding that the accused "act in wanton and wilful disregard of the likelihood that the natural tendency of [the] behavior is to cause death or great bodily harm"). Accordingly, we hold that the state court's shackling of Robinson constitutes harmless error. *See Lakin*, 431 F.3d at 966 ("Despite the substantial risk of prejudice that shackles pose, we are compelled to conclude that the error was harmless in this case due to the overwhelming evidence against [the defendant]."); *see also United States v. Lane*, 474 U.S. 438, 450 (1986) ("In

the face of overwhelming evidence of guilt shown here, we are satisfied that the claimed error was

harmless.").

III.

For the foregoing reasons, we **AFFIRM** the district court's denial of Robinson's petition for

a writ of habeas corpus.